STATE OF NEBRASKA EX REL. FREEZER SERVICES, INC., A NEBRASKA CORPORATION, RELATOR, V. J. PATRICK MULLEN, JUDGE, DISTRICT COURT FOR DOUGLAS COUNTY, NEBRASKA, RESPONDENT.
458 N.W.2d 245

Filed July 27, 1990.   No. 89-1365.

Kevin Colleran, of Cline, Williams, Wright, Johnson & Oldfather, for relator.

Robert M. Spire, Attorney General, and Charles E. Lowe for respondent.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This is an original action for a writ of mandamus. Relator,

Freezer Services, Inc., a Nebraska corporation, seeks a writ from this court compelling respondent, District Judge J. Patrick Mullen of the district court for Douglas County, Nebraska, to enter an order disqualifying the Omaha, Nebraska, law firm of McGrath, North, Mullin & Kratz, P.C. (McGrath, North), from representing the defendant in a lawsuit pending before Judge Mullen. We hold that a peremptory writ of mandamus should issue directing Judge Mullen to disqualify McGrath, North from further representation of defendant L.C. "Jake" Waller in that litigation.

The factual statement in this case is taken largely from the findings of fact made by a special master appointed by this court. The underlying lawsuit, captioned "Freezer Services, Inc., a Nebraska Corporation, v. L.C. ("Jake") Waller, District Court of Douglas County, Docket 864, Page 666," involves disputes concerning an employment contract between the two parties and certain stock options contained in that contract. The lawsuit has been pending since November 1987, when Freezer Services filed its petition in the Douglas County District Court. Additionally, there have been two other actions between Freezer Services and Waller, or other related parties, arising out of the same basic disputes. In January 1987, Waller filed suit in a Texas federal court against Freezer Services and its principal owner, Charles Myers, among others. That action was eventually dismissed. In September 1987, Waller filed suit in a Nebraska federal court against Myers and related companies, raising claims almost identical to those raised in the Texas litigation.

Starting in 1984 and continuing through June 1989, Freezer Services and Myers were represented by the law firm of North & Black, P.C., of Omaha. North & Black acted as counsel and was in an attorney-client relationship with Freezer Services during all of that period.

In the spring of 1989, Myers became aware of alleged malpractice by John North, Jr., in an unrelated matter involving Myers or his companies. On May 23, 1989, Myers discharged John North, Jr., and North & Black from further representation of Freezer Services and its related company in

Texas. However, it was agreed that North & Black would provide assistance in the pending lawsuits to newly retained counsel for some period of time.

In May 1989, Freezer Services retained the Lincoln, Nebraska, law firm of Cline, Williams, Wright, Johnson & Oldfather (Cline, Williams) to represent it and Myers in the pending litigation, including the action in the Douglas County District Court, which had been tentatively set for trial in July. The trial was continued to October 23.

For some unknown period of time preceding August 31, 1989, North & Black and McGrath, North were negotiating, with the partners and associates of North & Black becoming members of McGrath, North. McGrath, North has represented Waller throughout the state court litigation and also represents Waller in the Nebraska federal court litigation. The lead attorney for McGrath, North in that litigation is Mark F. Enenbach.

On August 31, members of Cline, Williams learned through a report of an employee of Freezer Services that there was a rumor that North & Black had merged or was about to merge with McGrath, North. Kevin Colleran, an attorney with Cline, Williams, called John North, Jr., that same day to inquire whether the rumors were true. North responded that the two firms were not "merging" but that an agreement had been reached whereby John North, Jr., Pamela Black, and other attorneys and employees of North & Black were to become employees of McGrath, North by mid-September 1989.

On September 1, Stephen Nelsen of Cline, Williams telephoned Enenbach to confirm the rumor regarding McGrath, North. Enenbach indicated that several of the attorneys and staff members of North & Black were becoming employees of McGrath, North. Enenbach indicated that he had just heard of the decision to hire these individuals. In this telephone conversation Enenbach indicated that McGrath, North would put into effect procedures to isolate John North, Jr., and other former North & Black employees from involvement with the underlying action. He further indicated that he had spoken with John North, Jr., about these rules and he had agreed to comply with them.

Some time after conferring with Nelsen on September 1, Enenbach circulated a memorandum, dated September 5, to all attorneys and all McGrath, North support staff. That memorandum reads in full:

This office represents L. C. "Jake" Waller who is presently involved in litigation in state and federal court against Charles Myers and entities which he has an interest in, including Freezer Services, Inc. of Texas, Freezer Services, Inc., Freezer Services of Kansas, Superior Industries, Freezer Services of Arkansas, and American Freezer Services, Inc.

Myers and those entities were formally [sic] represented by the law firm of North & Black, P.C., whose attorneys and staff are becoming employees of this firm. The attorneys and staff will move into our building on or about October 1, 1989.

With respect to this litigation or any other matter regarding Messrs. Myers and Waller or the listed entities, the following rules will apply:

1. You should not discuss this litigation or any matters which might relate in any way to Mr. Myers or the entities listed with any members of North & Black, P.C. who become employees of this firm. This includes any staff members of North & Black, P.C.

2. Do not request any information or documents from these new employees.

3. All files regarding this litigation will remain in my office in a locked file cabinet under my control.

4. Members of the law firm North & Black, P.C. who become employees of this firm and any of its staff will be advised of these procedures.

5. Any other new employees of this firm will be advised of these procedures as well.

If anyone has any questions, please see me.

Despite the screening mechanism, Freezer Services insisted that the new relationship between McGrath, North and former North & Black attorneys and employees created an irresolvable conflict of interest if McGrath, North continued to represent Waller in the pending lawsuit. McGrath, North disagreed with

Cline, Williams' assessment, however, and declined to withdraw as counsel for Waller because of the hardship on Waller. On September 21, 1989, Freezer Services filed a motion in the Douglas County District Court, requesting that McGrath, North be disqualified from further participation in Waller's defense. Evidentiary hearings on this motion were held before Judge Mullen on September 26 and October 2. On October 6, Judge Mullen entered an order overruling the motion to disqualify McGrath, North as Waller's counsel in the state court litigation. However, Judge Mullen, at the same time, also specifically ordered:

(1) Any person in any way connected with the firm of McGrath, North, Mullin & Kratz, P.C. shall not communicate with any person formerly associated in any way with the firm of North & Black, P.C. concerning this litigation or any other matter which might relate to L.C. Waller or Charles Myers or any of Charles Myers' related entities.

(2) Any person previously connected in any way with the firm of North & Black, P.C. shall not communicate with any person connected with the firm of McGrath, North, Mullin & Kratz, P.C. concerning this litigation or any other matter which might relate to L.C. Waller or Charles Myers or any of Charles Myers' related entities.

(3) All files and related data shall remain under the exclusive control of attorney Mark F. Enenbach.

(4) Any new employees of McGrath, North, Mullin & Kratz, P.C. shall receive a copy of this order.

(5) Any files or data regarding any of the above referred to matter which are under the control of former members of the firm of North & Black, P.C. shall remain off the premises of McGrath, North, Mullin & Kratz, P.C.

Freezer Services was dissatisfied with Judge Mullen's order and attempted to appeal directly to this court. That appeal was dismissed by this court on November 16, 1989. Freezer Services also filed an application for leave to file an original action of mandamus in this court, and on November 17 we issued an alternative writ of mandamus directed to Judge Mullen. A showing in opposition to issuance of a writ of mandamus was

filed on behalf of Judge Mullen on December 11. We then appointed, on December 20, Lancaster County District Judge Earl J. Witthoff as a special master to "conduct an evidential hearing and make findings of fact" in the mandamus action. On January 24, 1990, respondent filed a motion in limine to prohibit relator from offering into evidence at the hearing before the special master any evidence which was not offered and received into evidence in the district court on relator's motion to disqualify counsel. The motion in limine was sustained. The special master held an evidentiary hearing on February 13, 1990, and made findings of fact.

There are three issues presented in this original action for a writ of mandamus: first, whether Judge Witthoff properly sustained the motion in limine, thereby limiting the evidence which he considered in making the factual findings; second, whether this action for a writ of mandamus should be considered by this court; and third, whether this court should issue a peremptory writ of mandamus, thereby mandating the disqualification of McGrath, North from further participation in the underlying action.

We will initially consider the third issue. To resolve this broad issue we must first resolve the narrower issue of whether a law firm which represents one party in a pending lawsuit must be disqualified from further representation of that party when the law firm hires attorneys and personnel who have worked closely with and represented the opposing party in that same litigation.

Initially, it is clear that an attorney or attorneys may not represent a party whose interests are directly adverse to a former client's and where the subject matter involved is the same as that for which the attorney or attorneys represented the former client. North & Black had been in an attorney-client relationship with Freezer Services from 1984 to June 1989. Most significantly, however, John North, Jr., was intimately involved with the litigation currently pending before Judge Mullen on behalf of Freezer Services. North and the other North & Black attorneys cannot switch sides in the course of the litigation and represent an adverse party in the same litigation. Such representation would be repugnant to the principles of

loyalty and confidentiality underlying the attorney-client relationship and is prohibited by the Code of Professional Responsibility and the common law of this state. See Canons 4, 5, and 9 of the Code of Professional Responsibility. As we stated long ago in *Baker v. Farnsworth*, 117 Neb. 504, 221 N.W. 17 (1928): "Public policy forbids an attorney from representing a party to litigation, over objection, where the subjects involved are the same or inseparably related, against an adversary whom the attorney previously served." (Syllabus of the court.) That principle was reiterated in *Federal Trust Co. v. Damron*, 124 Neb. 655, 664, 247 N.W. 589, 592 (1933), where we stated that

> [a]n attorney, after receiving the confidence of a client, may not enter the service of others whose interests are adverse to such client, in the same subject-matter to which the confidence relates, or in matters so closely allied thereto as to be, in effect, a part thereof.

But see *Bellairs v. Dudden*, 194 Neb. 5, 230 N.W.2d 92 (1975) (an attorney is not barred from representing a subsequent client against a former client if the duties required of him do not conflict with those involved in the first employment). Additionally, Freezer Services did not consent to such a representation. Although a client's consent after full disclosure may make the representation ethically proper, such representation is disfavored in this state. See *Wendell's, Inc. v. Malmkar*, 225 Neb. 341, 405 N.W.2d 562 (1987), where we stated with respect to concurrent representation: "Representation of multiple parties is not prohibited per se, but this court disapproves the actions of an attorney in representing conflicting interests in litigation, even with the consent of the clients involved." (Syllabus of the court.) In the present case it is clear that at least John North, Jr., must be disqualified.

We must next consider whether John North, Jr.'s, disqualification must be imputed to McGrath, North. As stated in *Kearns v. Fred Lavery/Porsche Audi Co.*, 573 F. Supp. 91, 96 (E.D. Mich. 1983):

> Confidences and secrets possessed by an attorney are presumptively possessed by other members of his firm. *See Trone v. Smith*, [621 F.2d 994 (9th Cir. 1980)]; *Westinghouse Electric Corporation v. Kerr-McGee*

*Corporation*, [580 F.2d 1311 (7th Cir. 1978)]; *Schloette* [sic] *v. Railoc of Indiana, Inc.*, [546 F.2d 706 (7th Cir. 1976)]; and DR 5-105(D) of the Code of Professional Responsibility.

As used in this opinion, "confidences" refers generally to both "confidences" and "secrets" as defined in the code. See Canon 4, DR 4-101(A), of the Code of Professional Responsibility. The presumption of shared confidences has two levels in cases where an attorney leaves one firm and joins another firm, and where the second firm represents an interest adverse to an interest represented by the first firm. See *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564 (Fed. Cir. 1984). On the first level, the attorney who leaves the first firm is presumed to have acquired client confidences during his tenure at that firm, regardless of whether the attorney was actually privy to any confidential communications. On the second level, it is presumed that the attorney has shared or will share those client confidences with members of any subsequent firm where the attorney becomes employed. The two presumptions can have particular significance when the attorney joins the second firm. In some factual situations the second firm might be disqualified by reason of a double presumption of shared confidences which works to impute disqualification to that firm. But see *Panduit Corp., supra* (under certain facts, the double imputation theory would invent conflicts where none exist). That situation, however, is not presented in this case. The evidence clearly demonstrates that John North, Jr., has actual knowledge of Freezer Services' confidences directly related to the Waller litigation pending before Judge Mullen. The first level of the presumption of shared confidences is therefore not implicated, and we will focus on the presumption's second level.

The principle that client confidences are presumptively shared by other firm members is reflected in Canon 5, DR 5-105(D), of the Code of Professional Responsibility, which provides: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment." The knowledge possessed by John North, Jr., regarding the Waller

litigation, acquired through his representation of Freezer Services, is imputed to McGrath, North, and, under a literal interpretation of DR 5-105(D), the firm must be disqualified from further representing Waller in the litigation against Freezer Services.

Recognizing these principles, however, the respondent maintains DR 5-105(D) does not mandate disqualification of a firm in every case. Respondent maintains that McGrath, North does not have to be disqualified from representing Waller as long as former North & Black personnel and attorneys, especially John North, Jr., can be effectively screened from the rest of McGrath, North with regard to this litigation. Respondent contends that McGrath, North's in-house screening procedure and the October 6 screening order create an impenetrable "Chinese wall" between former North & Black attorneys and personnel and McGrath, North attorneys and personnel. In support of this proposition, respondent has relied on *Nemours Foundation v. Gilbane, Aetna, Federal Ins.*, 632 F. Supp. 418 (D. Del. 1986); *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. 1980), *vacated on other grounds* 449 U.S. 1106, 101 S. Ct. 911, 66 L. Ed. 2d 835 (1981); *NFC, Inc. v. General Nutrition, Inc.*, 562 F. Supp. 332 (D. Mass. 1983). In those cases the courts refused to disqualify an entire firm when an attorney who joined the firm had at least some knowledge about the litigation due to some level of involvement with the opposing party in the same or related litigation. The courts permitted the establishment of a Chinese wall to screen the disqualified attorney from the rest of the firm.

In the cases where the subsequent firm has not been vicariously disqualified, the implicit or explicit analytical linchpin is a determination that the presumption of shared confidences has been or can be rebutted. There is a strong trend in the federal courts holding that the presumption is rebuttable. See, *Smith v. Whatcott*, 757 F.2d 1098 (10th Cir. 1985); *U.S., Lord Elec. Co. v. Titan Pacific Const.*, 637 F. Supp. 1556 (W.D. Wash. 1986), and cases cited therein. See, also, Annot., 51 A.L.R. Fed. 678 (1981). The analytical framework to rebut the presumption can be fairly formalistic. For example, in *Schiessle v. Stephens*, 717 F.2d 417 (7th Cir. 1983), the court enunciated a

three-step analysis to determine whether a firm must be vicariously disqualified. In the first step the court determines whether a substantial relationship exists between the subject matter of the prior and subsequent representations.

The second and third steps in *Schiessle* concern the two levels of the presumption of shared confidences mentioned above. The second step in the analysis requires the court

> to ascertain whether the presumption of shared confidences which arises from our determination that the representations are substantially related has been rebutted with respect to the prior representation. In other words, we must determine whether the attorney whose change of employment created the disqualification issue was actually privy to any confidential information his prior law firm received from the party now seeking disqualification of his present firm. The evidence presented to rebut this presumption must "clearly and effectively" demonstrate that the attorney in question had no knowledge of the information, confidences and/or secrets related by the client in the prior representation.

*Id.* at 420.

In the third step, the court must determine whether the presumption of shared confidences has been rebutted with respect to the subsequent representation. The court must determine whether the knowledge of the "confidences and secrets" of the former client which the attorney brings with him has been passed on to or is likely to be passed on to the members of the second firm. The court commented that

> [i]n *LaSalle Nat. Bank*, 703 F.2d at 259, we held that the presumption of shared confidences could be rebutted by demonstrating that "specific institutional mechanisms" (e.g. "Chinese Walls") had been implemented to effectively insulate against any flow of confidential information from the "infected" attorney to any other member of his present firm. Such a determination can be based on objective and verifiable evidence presented to the trial court and must be made on a case-by-case basis. Factors appropriate for consideration by the trial court might include, but are not limited to, the size and

structural divisions of the law firm involved, the likelihood of contact between the "infected" attorney and the specific attorneys responsible for the present representation, the existence of rules which prevent the "infected" attorney from access to relevant files or other information pertaining to the present litigation or which prevent him from sharing in the fees derived from such litigation.

717 F.2d at 421.

This three-step approach was adopted by the U.S. Court of Appeals for the Sixth Circuit in *Manning v. Waring, Cox, James, Sklar and Allen*, 849 F.2d 222 (6th Cir. 1988). Some authorities, such as those cited by respondent, have adopted a flexible, amorphous approach. The U.S. Court of Appeals for the Second Circuit, in *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. 1980), has expressed its approval of the use of screening in situations where a former government attorney has joined a private firm, where the firm's continued representation results in no "threat of taint" to the trial process.

Similarly, in *Nemours Foundation v. Gilbane, Aetna, Federal Ins.*, 632 F. Supp. 418 (D. Del. 1986), a case not involving a former government attorney, the court stated at 425:

> There is now an explicit exception to imputed disqualification. The Rules, unlike the Code, sanction the use of a screening mechanism in appropriate circumstances, specifically referring to former government attorneys. Rule 1.11 [of the Delaware Lawyers' Rules of Professional Conduct] states: "A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom."

The court added:

> The rigid formalism underlying Canon 9's injunction against an "appearance of impropriety" is strongly rejected in favor of a new philosophy of pragmatism which balances the expectations of confidentiality of a

former client against the importance of allowing a client the representation of his choice and promoting the mobility of attorneys, particularly associates, from one private law firm to another.

*Id.*

The court held that "an appropriate screening mechanism, in the proper circumstances, may rebut the presumption of shared confidences that arises under Rule 1.10 in cases where the disqualified attorney's conflict of interest originated in private practice." *Id.* at 428.

In *NFC, Inc. v. General Nutrition, Inc.*, 562 F. Supp. 332 (D. Mass. 1983), the court stated that, although ethical standards should not give way to a "balancing of the harms" analysis, "care should be taken to avoid applying the disqualification sanction of the Code in a mechanical, computerized fashion. Rather, the factors affecting a particular set of relationships should be carefully analyzed with the purpose of arriving at an individualized judgment and a truly responsive remedy." *Id.* at 334. The court found that "a detailed court-ordered and supervised embargo on any communications" between the second firm and the disqualified attorney was an acceptable alternative to disqualification, implicitly allowing the use of screening procedures to rebut the presumption of shared confidences. *Id.*

In the present case respondent is in essence asking this court to adopt a rule whereby the presumption of shared confidences in the subsequent representation can be rebutted by showing that "specific institutional mechanisms," such as the Chinese wall, have been implemented to prevent the flow of confidences from the disqualified attorney to the rest of the firm. Although such a rule might be appropriate in a particular case, we decline to adopt that rule here.

While there is no Nebraska authority regarding the propriety of screening measures when one attorney must be disqualified, we do not find the authorities relied upon by respondent persuasive for the situation presented in this case. At a minimum, those cases are factually distinguishable from the present case by the level of the "infected" attorney's involvement in the litigation. A more perplexing factual

situation is presented here due to North & Black's, but especially John North, Jr.'s, deep involvement in the Waller litigation on behalf of Freezer Services. The litigation for which McGrath, North represents Waller is not only substantially related to John North, Jr.'s, former representation, it is the same. We therefore hold that when an attorney who was intimately involved with the particular litigation, and who has obtained confidential information pertinent to that litigation, terminates the relationship and becomes associated with a firm which is representing an adverse party in the same litigation, there arises an irrebuttable presumption of shared confidences, and the entire firm must be disqualified from further representation. This rule is consistent with Canons 4, 5, and 9 and DR 5-105(D) of the Code of Professional Responsibility, *Baker v. Farnsworth*, 117 Neb. 504, 221 N.W. 17 (1928), and *Federal Trust Co. v. Damron*, 124 Neb. 655, 247 N.W. 589 (1933). Through this rule the court, the parties, and the public can be assured that client confidences will be secure and will not pass, intentionally or inadvertently, from one party to an opposing party in the same litigation.

The evidence in the present case shows that Freezer Services and Myers were represented by North & Black from sometime in 1984 and continuing through June 1989, when Myers discharged the firm from further representation. During the $2^1/2$ years prior to September 1989, Freezer Services paid North & Black over $600,000 in legal fees. The firm, and especially John North, Jr., was counsel for Freezer Services and Myers in the Nebraska and Texas federal court litigation and in the Nebraska state court litigation. During this litigation, John North, Jr., was deeply involved in preparing and filing pleadings, conducting investigations and discovery, and making trial preparations and developing strategies on behalf of Freezer Services and Myers. John North, Jr., was involved in a number of activities, including correspondence, corporate meetings, telephone conversations, and other matters leading to Waller's termination from employment with Freezer Services, which formed the basis for the present litigation. After Cline, Williams was hired as replacement counsel in May 1989, John North, Jr., transferred his files relating to the

litigation to Cline, Williams and consulted with that firm during May, June, and perhaps into July of that year. By mid-July, no additional services were rendered to Freezer Services by any member of North & Black. John North, Jr., went to work for McGrath, North sometime around September 1, 1989.

The facts in the present case are clear that John North, Jr., was intimately involved with the present litigation on behalf of Freezer Services and Myers and has obtained confidential information pertinent to that litigation. Shortly after being discharged from further employment by Freezer Services and Myers, John North, Jr., and other members of North & Black became employed by McGrath, North, which represents an adverse party, Waller, in the same litigation. Under the rule announced today, the presumption of shared confidences is irrebuttable, and McGrath, North must be disqualified from further representation of Waller.

We also note the decision in *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263 (7th Cir. 1983). In that case an entire law firm changed sides and, with the assistance of another firm acting as trial counsel, began to represent an adverse party in litigation which was substantially related to the former representation. The court stated at 1267:

> There is an exception [to disqualification] for the case where a member or associate of a law firm (or government legal department) changes jobs, and later he or his new firm is retained by an adversary of a client in his former firm. In such a case, even if there is a substantial relationship between the two matters, the lawyer can avoid disqualification by showing that effective measures were taken to prevent confidences from being received by whichever lawyers in the new firm are handling the new matter. [Citations omitted.] The exception is inapplicable here; the firm itself changed sides.

The court also specifically rejected the use of Chinese walls in cases where the firm switches sides: "[A] law firm is not permitted to switch sides if its former representation was substantially related to its new representation, no matter what screens it sets up." *Id.* at 1268. Cf. *Schiessle v. Stephens*, 717

F.2d 417 (7th Cir. 1983). Additionally, the court indicated that where a firm switches sides, Canon 9 alone would be the basis for a strict rule of disqualification:

> While "appearance of impropriety" as a principle of professional ethics invites and maybe has undergone uncritical expansion because of its vague and open-ended character, in this case it has meaning and weight. For a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the lay public—or for that matter the bench and bar—by the filing of affidavits, difficult to verify objectively, denying that improper communication has taken place or will take place between the lawyers in the firm handling the two sides. Clients will not repose confidences in lawyers whom they distrust and will not trust firms that switch sides as nimbly as Schwartz & Freeman.

708 F.2d at 1269.

In the present case we are unable to determine from the special master's factual findings whether North & Black was subsumed in its entirety into McGrath, North. In any event, we simply note that where the facts are clear that an entire firm, or a significant portion thereof, has switched sides and now represents an adverse party in the same or closely related litigation, *Analytica* might be persuasive authority to provide an alternative analysis.

We must next address whether a petition for a writ of mandamus is properly before this court. To warrant the issuance of a peremptory writ of mandamus to compel the performance of a legal duty to act, (1) the duty must be imposed by law, (2) the duty must still exist at the time the writ is applied for, and (3) the duty to act must be clear. *State ex rel. Stansbery v. Schwasinger*, 205 Neb. 457, 289 N.W.2d 506 (1980); *State ex rel. Doe v. Mid-Neb. Retard. Serv.*, 214 Neb. 381, 333 N.W.2d 909 (1983). Mandamus lies only to enforce performance of a ministerial act or duty, and not to control judicial discretion. *State ex rel. Labedz v. Beermann*, 229 Neb. 657, 428 N.W.2d 608 (1988); *State ex rel. Wright v. Pepperl*, 221 Neb. 664, 380 N.W.2d 259 (1986); Neb. Rev. Stat. § 25-2156 (Reissue 1989).

"The general rule is that an act is ministerial if there is an absolute duty to perform in a specified manner upon the existence of certain facts." *State ex rel. Hilt Truck Line v. Peterson*, 215 Neb. 81, 86, 337 N.W.2d 133, 136 (1983). We also stated in *State ex rel. Simpson v. Vondrasek*, 203 Neb. 693, 279 N.W.2d 860 (1979):

> It is a general rule in this jurisdiction that mandamus will not issue to review the action of an inferior court where there is an adequate remedy at law, and the writ may not be used to usurp or take the place of a writ of error or an appeal. However, when the remedy, though available, is inadequate, mandamus will lie.

(Syllabus of the court.)

In light of the rule enunciated today, Judge Mullen has a duty to act which is imposed by law and which was not moot when Freezer Services applied for the writ of mandamus. The duty is clear and absolute; Judge Mullen has no discretion on the facts of this case not to disqualify McGrath, North from further representation of Waller. Additionally, an appeal is an inadequate means to present this issue for review. By the time the issue could be presented to an appellate court, any divulgence of confidences will have already occurred, and an appellate court cannot return the parties to the status quo ante. Relator's petition for a writ of mandamus is properly before this court.

Lastly, relator contends the special master erred in sustaining respondent's motion in limine. By sustaining this motion the special master limited the evidence submitted in the factfinding hearing to the record made before Judge Mullen in the district court. It is not necessary for us to reach this issue. The factual basis before this court is adequate to resolve the underlying issue.

Accordingly, we conclude that a peremptory writ of mandamus should issue directing the district court to disqualify McGrath, North from further representation of Waller in the litigation captioned "Freezer Services, Inc., a Nebraska Corporation v. L.C. ("Jake") Waller, District Court of Douglas County, Docket 864, Page 666."

PEREMPTORY WRIT ISSUED.

HASTINGS, C.J., not participating.