## VI. CONCLUSION

We find no abuse of discretion by the district court in its procedures for determining the admissibility of evidence of Valverde's prior sexual assaults. Because Valverde moved for a mistrial before any evidence of the prior sexual assaults had been adduced, the district court did not abuse its discretion in overruling the motion. Finally, we find no reversible error by the court in the jury instructions that it gave or in the rejection of Valverde's proposed instructions. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

---

MID AMERICA AGRI PRODUCTS/HORIZON, LLC, ET AL., relators, v. HONORABLE DONALD E. ROWLANDS, JUDGE, DISTRICT COURT FOR LINCOLN COUNTY, NEBRASKA, respondent, and LANSING TRADE GROUP, LLC, AND LANSING ETHANOL SERVICES, LLC, intervenors.

___ N.W.2d ___

Filed July 19, 2013.    No. S-12-473.

1. **Mandamus.** A court issues a writ of mandamus only when (1) the relator has a clear right to the relief sought, (2) a corresponding clear duty exists for the respondent to perform the act, and (3) no other plain and adequate remedy is available in the ordinary course of law.

2. **Mandamus: Proof.** In a mandamus action, the party seeking mandamus has the burden of proof and must show clearly and conclusively that such party is entitled to the particular thing the relator asks and that the respondent is legally obligated to act.

3. **Verdicts: Evidence: Appeal and Error.** Recommended factual findings of a special master have the effect of a special verdict, and the report upon questions of fact, like the verdict of a jury, will not be set aside unless clearly against the weight of the evidence.

4. **Mandamus: Words and Phrases.** A writ of mandamus is issued to compel the performance of a purely ministerial act or duty, imposed by law upon an inferior tribunal, corporation, board, or person.

5. ____: ____. Mandamus is a law action and is an extraordinary remedy, not a writ of right.

6. **Attorneys at Law: Expert Witnesses.** The central concern in cases in which counsel has retained a side-switching expert is whether counsel has unfairly obtained confidential information about the opposing party.

Original action. Writ of mandamus denied.

George E. Clough, of Clough Law Office, and Paul H. Schwartz, of Shoemaker, Ghiselli & Schwartz, L.L.C., for relators.

Jay C. Elliott, of Elliott Law Office, P.C., L.L.O., Kirk T. May and Jeremy M. Suhr, of Rouse, Hendricks, German & May, P.C., and William G. Dittrick and Kenneth W. Hartman, of Baird Holm, L.L.P., for intervenor Lansing Trade Group, LLC.

No appearance for respondent.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, and Cassel, JJ.

Wright, J.

## I. NATURE OF CASE

This action presents the question whether a law firm should be disqualified for retaining an expert who, prior to being retained, consulted with opposing counsel on the same matter. Lansing Trade Group, LLC, and Lansing Ethanol Services, LLC (collectively Lansing), commenced an action against Mid America Agri Products/Horizon, LLC, and other defendants (collectively Horizon) over certain "forward corn contracts." Counsel for Horizon attempted to retain a grain industry expert and conveyed confidential information to him. Lansing's counsel later retained the same expert. The district court for Lincoln County, Nebraska, the respondent in this proceeding, sustained Horizon's motion to disqualify the expert from testifying but overruled Horizon's subsequent motion to disqualify Lansing's counsel. Horizon filed this original action seeking a writ of mandamus requiring the district court to disqualify Lansing's counsel. For the following reasons, we deny the writ.

## II. SCOPE OF REVIEW

[1,2] A court issues a writ of mandamus only when (1) the relator has a clear right to the relief sought, (2) a corresponding clear duty exists for the respondent to perform the act, and (3) no other plain and adequate remedy is available in the ordinary course of law. *Schropp Indus. v. Washington Cty. Atty.'s Ofc.*, 281 Neb. 152, 794 N.W.2d 685 (2011). The party seeking mandamus has the burden of proof and must show clearly and conclusively that such party is entitled to the particular thing the relator asks and that the respondent is legally obligated to act. *Id.*

[3] Recommended factual findings of a special master have the effect of a special verdict, and the report upon questions of fact, like the verdict of a jury, will not be set aside unless clearly against the weight of the evidence. See *Larkin v. Ethicon, Inc.*, 251 Neb. 169, 556 N.W.2d 44 (1996).

## III. FACTS

### 1. Communications With Horizon's Counsel

Lansing brought an action against Horizon in 2009 relating to "forward corn contracts." Lansing is the plaintiff in the underlying action and the intervenor in the present action. Horizon is the defendant in the underlying action and the relator in the present action. In November 2010, James Nesland, a lead defense attorney for Horizon, contacted Howard J. O'Neil as a possible expert witness for Horizon. They discussed the National Grain and Feed Association (NGFA) Grain Trade Rules.

According to Nesland, O'Neil said he could serve as a defense expert despite being well acquainted with Lansing. Nesland claimed that because of O'Neil's experience as an expert and willingness to assist the defense, Nesland "reasonably believed that [their] communications were in confidence." Once O'Neil agreed to be a defense expert, Nesland shared his thoughts, opinions, impressions, and ideas concerning the testimony he believed important regarding the NGFA. He specifically discussed his views about the case.

O'Neil claims he did not recall Nesland's providing him with proprietary information. Nesland received an e-mail from O'Neil dated January 6, 2011, stating that O'Neil did not have time to work on the case. O'Neil recommended another expert, whom he copied on the e-mail, but he had "'not shared any of your [proprietary] information with him.'" Nesland and O'Neil corresponded about another expert Horizon might retain.

After February 2011, Robert Christie, Nesland's cocounsel, undertook primary responsibility for developing Horizon's experts. About 2 months later, Christie contacted O'Neil, and at that time, O'Neil was available to discuss the case on a confidential basis.

During their conversation on May 4, 2011, O'Neil informed Christie that he was not comfortable testifying because of his long-term relationship with a company named "The Andersons," a part owner of Lansing. Christie said that O'Neil had no objection to confidentially acting as a nontestifying consultant and opining on NGFA rules and related issues. Based on assurances from O'Neil that their communications were confidential, Christie discussed confidential information, including his opinion on the issues where O'Neil's expertise was relevant.

O'Neil described the conversation as an "exchange of pleasantries" and a general discussion of NGFA rules. O'Neil said he told Christie he could not consult for him against Lansing. Christie then asked whether O'Neil would be willing to discuss NGFA rules generally, which he agreed to do. O'Neil said he did not remember discussing a company named "The Andersons" and did not believe Christie shared confidential information and did not consider anything in their conversation confidential. O'Neil said Christie told him that Lansing's position was incorrect and that Lansing had not lived up to its contracts. O'Neil understood this to mean Horizon was adverse to Lansing. He did not recall that anyone from Horizon gave him any other impressions or strategies regarding the case.

Christie said that a few days later, he and O'Neil exchanged views and opinions. Christie remembered confirming O'Neil's

agreement to keep information confidential. Following this second conversation, Christie received a $225 invoice from O'Neil for the May 4, 2011, call. The firm paid the invoice. This was the only invoice O'Neil sent to Horizon. There was no written retention agreement between O'Neil and Horizon.

## 2. COMMUNICATIONS WITH
### LANSING'S COUNSEL

In November 2011, Kirk May, an attorney for Lansing, spoke to O'Neil to determine if O'Neil was a suitable expert witness. O'Neil believed another lawyer had contacted him regarding the same case. He did not remember the lawyer's name, but "Bob Christie" sounded familiar. O'Neil mentioned a single conversation several months earlier. May believed that Christie would not share confidential information with O'Neil once Christie knew of O'Neil's connection with Lansing. May also expected that if Horizon had retained O'Neil, it would have executed a written retention agreement.

On November 20, 2011, May sent O'Neil a confirmation of his retention as a plaintiff's expert for Lansing. O'Neil confirmed his retention and e-mailed Christie on November 26, saying that he could not assist Horizon in the matter. According to Christie, O'Neil said he could not be a defense expert for Horizon because his connections to Lansing would cause a conflict of interest. However, in an e-mail sent to Christie on November 30, O'Neil recommended potential experts. May did not know until April 2012 that O'Neil was providing Horizon with names of potential experts.

O'Neil proceeded to work for Lansing and provided an expert report. On February 16, 2012, Lansing disclosed O'Neil as an expert witness and provided a copy of O'Neil's report to the defense. Christie claimed this was the first time he knew Lansing had retained O'Neil. The report addressed subject matter he discussed with O'Neil.

On February 20, 2012, a lawyer for Horizon sent May an e-mail stating Horizon's counsel had shared confidential information with O'Neil and paid for his services. On the same day, O'Neil sent May a copy of his November e-mail to Christie stating he could not be an expert for Horizon. This

was the first time O'Neil informed May of this exchange with Christie.

The next day, O'Neil told May that Christie had not shared any confidential information with him. O'Neil claimed that no one acting for Horizon shared defense strategy with him and that he did not have or share confidential information about the defense with May or Lansing's firm.

### 3. Trial Court's Order

Horizon moved to disqualify O'Neil as a witness. The court sustained the motion and disqualified O'Neil from testifying as an expert witness. On April 6, 2012, Horizon moved to reopen discovery to explore whether Lansing's counsel should be disqualified. That motion was overruled. On April 27, Horizon moved to disqualify Lansing's counsel, and the court overruled the motion.

The trial court found that Horizon had been unable to advance any evidence that Horizon's trial strategy, work product, or mental impressions had been communicated by O'Neil to May. It declined to find that May, his firm, and his cocounsel created an appearance of impropriety which would taint the proceedings. It concluded that the remedy which it had already imposed upon Lansing, preventing it from calling O'Neil as an expert witness, was more than sufficient to guarantee Horizon a fair trial.

### 4. Mandamus Action

Horizon applied for leave to file an original action for a writ of mandamus requiring the district court (hereinafter Respondent) to disqualify Lansing's counsel. Lansing defended the action as an intervenor. We granted leave to file an original action and issued an alternative writ of mandamus requiring the Respondent to disqualify Lansing's counsel or show cause why the writ should not issue.

We appointed a special master. She concluded that O'Neil was not a support person as defined by Neb. Ct. R. of Prof. Cond. § 3-501.9(f). She accepted the finding of the Respondent that a confidential relationship existed and that confidential information had been communicated by Horizon to O'Neil,

but that at no time did O'Neil communicate to Lansing any of the discussions or communications which O'Neil had with Horizon's counsel. The special master found that any presumption of disclosure was rebutted by Lansing and that Lansing's counsel's continued representation did not threaten to taint further proceedings.

She concluded that Horizon failed to establish it had a clear right to the disqualification of Lansing's counsel and failed to establish that Respondent was legally obligated to order disqualification. She also concluded that Respondent did not abuse its discretion in refusing to disqualify Lansing's counsel and that Horizon was not entitled to a writ of mandamus.

## IV. ASSIGNMENT OF ERROR

Horizon assigns that the trial court erred in overruling its motion to disqualify Lansing's counsel.

## V. ANALYSIS

### 1. Mandamus

#### (a) Legal Principles

Horizon seeks a writ of mandamus from this court requiring the Respondent to disqualify Lansing's counsel because of its retention of O'Neil as an expert witness. Typically, the denial of a motion to disqualify will be challenged by mandamus. See *McCully, Inc. v. Baccaro Ranch*, 279 Neb. 443, 778 N.W.2d 115 (2010).

[4,5] The following legal principles apply to an action for writ of mandamus. A writ of mandamus is issued to compel the performance of a purely ministerial act or duty, imposed by law upon an inferior tribunal, corporation, board, or person. *Stetson v. Silverman*, 278 Neb. 389, 770 N.W.2d 632 (2009). Mandamus is a law action and is an extraordinary remedy, not a writ of right. See *id*. A court issues a writ of mandamus only when (1) the relator has a clear right to the relief sought, (2) a corresponding clear duty exists for the respondent to perform the act, and (3) no other plain and adequate remedy is available in the ordinary course of law. *Schropp Indus. v. Washington Cty. Atty.'s Ofc.*, 281 Neb. 152, 794 N.W.2d 685 (2011). The party seeking mandamus has the burden of proof

and must show clearly and conclusively that such party is entitled to the particular thing the relator asks and that the respondent is legally obligated to act. *Id*.

### (b) § 3-501.9

Attorneys in Nebraska are governed by the Nebraska Rules of Professional Conduct. Section 3-501.9 is applicable to this matter and states:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client . . . .
>
>     . . . .
>
> (d) A lawyer shall not knowingly allow a support person to participate or assist in the representation of a current client in the same or a substantially related matter in which another lawyer or firm with which the support person formerly was associated had previously represented a client . . . .
>
> (e) If a support person, who has worked on a matter, is personally prohibited from working on a particular matter under Rule 1.9(d), the lawyer or firm with which that person is presently associated will not be prohibited from representing the current client in that matter if:
>
>     . . . .
>
>     . . . the support person is screened from any personal participation in the matter to avoid communication to others in the firm of confidential information that both the support person and the firm have a legal duty to protect.
>
> (f) For purposes of Rules 1.9(d) and (e), a support person shall mean any person, other than a lawyer, who is associated with a lawyer or a law firm and shall include but is not necessarily limited to the following: law clerks, paralegals, legal assistants, secretaries, messengers and other support personnel employed by the law firm. Whether one is a support person is to be determined by

the status of the person at the time of the participation in the representation of the client.

A brief history of § 3-501.9 sets the background for our resolution of this matter. Section 3-501.9 developed from a response to Nebraska case law regarding conflicts of interest that arise when lawyers move from one firm to another.

In *State ex rel. Freezer Servs., Inc. v. Mullen*, 235 Neb. 981, 458 N.W.2d 245 (1990), we disqualified a law firm from representing a defendant. The attorneys in a firm that had represented the plaintiff joined the defendant's firm. We presumed an attorney leaving one firm acquired client confidences while at the firm, regardless of whether the attorney was actually privy to any confidential communications. We also presumed the attorney shared or would share those confidences with members of any firm the lawyer subsequently joined. We held that

> when an attorney who was intimately involved with the particular litigation, and who has obtained confidential information pertinent to that ligation, terminates the relationship and becomes associated with a firm which is representing an adverse party in the same litigation, there arises an irrebuttable presumption of shared confidences, and the entire firm must be disqualified from further representation.

*Id.* at 993, 458 N.W.2d at 253.

In *State ex rel. FirsTier Bank*, 244 Neb. 36, 503 N.W.2d 838 (1993), an attorney was employed at a law firm while that firm worked on a case for a defendant. That attorney, and several other attorneys from the firm, formed a new firm with other attorneys. The new firm represented the plaintiffs in an underlying action. The six attorneys from the first firm who were still with the second firm at the time of the proceedings in *Buckley* testified by affidavit that they received no information on the underlying action. We adopted a bright-line rule:

> [A]n attorney must avoid the present representation of a cause against a client of a law firm with which he or she was formerly associated, and which cause involves a subject matter which is the same as or substantially related

to that handled by the former firm while the present attor-
ney was associated with that firm.

*Id.* at 45, 503 N.W.2d at 844.

The year after *Buckley*, this court applied the bright-line
rule to a law firm in *State ex rel. Creighton Univ. v. Hickman*,
245 Neb. 247, 512 N.W.2d 374 (1994). We held that opposing
counsel had to be disqualified after hiring a clerical worker
that, unbeknownst to the firm, had worked on the same case
as an attorney for an adverse party. We concluded that the
hardship worked by this result was outweighed by the need to
maintain the confidentiality of communications and avoid the
appearance of impropriety.

Following *Hickman*, the Lawyers' Advisory Committee
issued Nebraska Ethics Advisory Opinion for Lawyers No.
94-4. The opinion applied the bright-line rule to clerks, para-
legals, secretaries, and other ancillary staff members who
moved from one law firm to another. The opinion specifically
stated that screening was insufficient to avoid disqualification.
The opinion had the practical effect of preventing legal offices
from hiring administrators, paralegals, law clerks, secretar-
ies, and other ancillary personnel who had worked for legal
offices that had or would represent clients adverse to clients
of the hiring office. Due to potential conflicts of interest,
several law firms ceased hiring law clerks from Nebraska law
schools. In response to opinion No. 94-4, the Nebraska State
Bar Association petitioned this court to modify Nebraska's
Code of Professional Responsibility.

In 1997, this court adopted Canon 5, DR 5-109, of the
code. DR 5-109 defined a support person as a person other
than a lawyer associated with a lawyer or firm, and expressly
included law clerks, paralegals, legal assistants, secretaries,
and messengers. The rule prohibited a lawyer from knowingly
allowing a support person to assist in the representation of a
client if (1) the support person was associated with a firm that
represented a materially adverse party in the same or a sub-
stantially related matter and (2) the support person acquired
confidential information that was material to the matter.
Support persons were presumed to have acquired confidential
information until they proved otherwise. In September 2005,

DR 5-109 was replaced by § 3-501.9 when Nebraska's Code of Professional Responsibility was replaced by the Nebraska Rules of Professional Conduct.

### (c) Parties' Arguments

Horizon claims an irrebuttable presumption applies to an expert who receives confidential information from one party and then works for an adverse party on a substantially related matter. It claims that an irrebuttable presumption must apply to experts because a genuine threat exists that the information conveyed by the first party to the expert will benefit the adverse party. It maintains that even if the information is not disclosed, the expert cannot ignore it while working for the adverse party. Horizon argues there is a substantial risk of one party benefiting from an adverse party's confidential information when an expert is involved, because experts/consultants work on the "substance" of cases.

Lansing claims there is nothing in the record or Nebraska state law supporting the application of an irrebuttable presumption to an expert. It argues that Horizon had no clear right to disqualification and that Respondent had no clear duty to disqualify Lansing's counsel.

### (d) Resolution

Two questions are presented by this action: Was O'Neil a support person as defined by § 3-501.9(f) and, if not, should an irrebuttable presumption that O'Neil conveyed confidential information to Lansing's counsel apply? We have not previously considered whether experts are classified as support persons or should be subject to the irrebuttable presumption applied to lawyers. Other jurisdictions have not addressed issues involving support persons, because § 3-501.9(d) through (f) are unique to Nebraska. In defining a "support person," § 3-501.9(f) expressly excludes lawyers. Experts are not expressly addressed by the rule. They are not included as support persons, nor are they excluded. The person's classification as a support person is to be determined by his or her status at the time of the participation in the representation of the client. See *id*.

The term "support person" implies a continuing employ-ment associated with the day-to-day activities of the lawyer or firm. Support persons are not free to perform similar work for other lawyers or firms. Included within this category are law clerks, paralegals, legal assistants, secretaries, messengers, and other support personnel employed by the law firm. See § 3-501.9. Experts, on the other hand, are hired for a particular issue or problem and therefore do not fit into this category. They are independent of the control or authority which is exercised by the firm over its support personnel. Their infor-mation and expertise is usually sought for litigation requir-ing an opinion or testimony concerning a specific issue that requires specialized knowledge or skill. They are similar to independent contractors that are hired for their knowledge or skill to be applied to a specific task. They are not employees of the firm. Since they are hired to testify and give opinions at trial, they remain independent of the employment by the firm. A law clerk or paralegal could not be employed by a firm and also testify as an expert witness for the firm. See, Neb. Ct. R. of Prof. Cond. § 3-503.7(a) (stating "lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness"); Neb. Ct. R. of Prof. Cond. § 3-505.3(b) (stating "lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obliga-tions of the lawyer"). The expert could not be employed by the firm as a support person and also testify as an expert witness. The special master concluded that O'Neil was not a support person, and we agree.

We next address the presumption that is to be applied to O'Neil as an expert witness. How the rules of professional conduct should be applied is a question of law that we review independent of the conclusions of a respondent and a special master. See *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009). Section 3-501.9 distinguishes between lawyers and support persons regarding the application of the presumption of shared confidences.

Our precedents have applied an irrebuttable presumption only to persons who obtained confidential information while

working as lawyers. And for the reasons set forth, we conclude that an irrebuttable presumption of shared confidences shall be applied only to actions involving individuals who obtained confidential information as lawyers.

In *Bechtold v. Gomez*, 254 Neb. 282, 576 N.W.2d 185 (1998), a private attorney who was representing a client in a paternity case hired a law student to do work on a matter not related to the paternity case. The student previously worked for a legal clinic under a supervising attorney at a time when the clinic actively represented an opposing party in the paternity action. The trial court disqualified the clinic's supervising attorney. We reversed the disqualification because there was no evidence that the law student received any confidences from the private attorney regarding the paternity matter. The student could not have shared such confidences with the supervising attorney to warrant disqualifying the supervising attorney. We refused to apply an irrebuttable presumption of shared confidences to the law student. "In the cases where we have applied the irrebuttable presumption of shared confidences, the context has been that of an actual partnership or employment relationship." *Id.* at 290, 576 N.W.2d at 191 (collecting cases concerning attorney relationships).

Other courts have recognized a distinction between lawyers and experts and have not applied an irrebuttable presumption, which is described as a per se vicarious disqualification rule, to a side-switching expert. In *North Pacifica, LLC v. City of Pacifica*, 335 F. Supp. 2d 1045 (N.D. Cal. 2004), the court discussed the substantial differences between the roles played by experts and counsel. Attorneys have an ethical duty to represent and advocate for their clients and are bound by a duty of loyalty. *Id.* Moreover, the practical realities differ between a relationship an attorney has with an expert and that which an attorney has with other attorneys sharing a practice. *Id.* An attorney's disqualification extends to the entire firm, because when attorneys practice together, they presumptively share access to privileged and confidential matters. *Id.* The disqualification rule applied to attorneys "'recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their client's,

confidential information.'" *Id*. at 1051 (quoting *People v. SpeeDee Oil Change Systems, Inc*., 20 Cal. 4th 1135, 980 P.2d 371, 86 Cal. Rptr. 2d 816 (1999)). Vicarious disqualification is necessary to preserve both the confidentiality of client information, as well as public confidence in the legal profession and the judicial process by enforcing the attorney's duty of undivided loyalty. *Id*. See *City of Santa Barbara v. Superior Court*, 122 Cal. App. 4th 17, 18 Cal. Rptr. 3d 403 (2004).

That same relationship does not exist in the context of retained experts. See *North Pacifica, LLC, supra*. Their role is limited. *Id*. They are tasked with providing opinions on specific matters raised in the litigation. See *id*. They do not share the same duty of loyalty to clients. *Id*. There is no sustained relationship in a joint enterprise and common access to and sharing of information as is the case with attorneys sharing a law practice. *Id*.

[6] In *North Pacifica, LLC*, the plaintiff moved to disqualify the defendant's experts and current counsel. Following a hearing, the court disqualified the experts but did not disqualify the attorneys. The court stated that cases involving vicarious disqualification of the entire law firm were not applicable where the disqualified party is an expert and not a member of the firm. Instead of applying a per se vicarious disqualification rule that is applied to lawyers and law firms, courts have applied a fact-specific test where experts are concerned. The central concern in cases in which counsel has retained a side-switching expert is whether counsel has unfairly obtained confidential information about the opposing party. *Id*. The court set forth the test to be applied when counsel employs a side-switching expert. Under the test, the court determines: (1) Did the expert have confidential information pertaining to the first retaining party's trial preparation and strategy; (2) did he disclose it to the counsel who subsequently retained the expert; and (3) if so, does counsel's continued representation threaten to taint all further proceedings? See, *id*.; *Shadow Traffic Network v. Superior Court*, 24 Cal. App. 4th 1067, 29 Cal. Rptr. 2d 693 (1994).

In *Shadow Traffic Network, supra*, Metro Traffic Control, Inc. (Metro), was a competitor of Shadow Traffic Network

(Shadow Traffic) in the business of traffic reporting. Metro sued Shadow Traffic for various business torts. Attorneys for Metro interviewed members of an accounting firm to discuss retention of the accounting firm as expert witnesses. Metro's counsel informed the accounting firm that the conversation was confidential and proceeded to discuss trial strategies and theories. The accounting firm was ultimately not retained by Metro. A few weeks later, attorneys for Shadow Traffic met with two of the same accountants. The accountants told Shadow Traffic that Metro's attorneys had interviewed the firm for the same purpose of testifying as an expert, but had decided not to retain it. An attorney for Shadow Traffic spoke with another accountant who had discussed the case with Metro's counsel. Shadow Traffic then retained the accountant as a testifying expert and disclosed to Metro they had done so.

The trial court sustained Metro's motion to recuse Shadow Traffic's attorneys. The appellate court articulated a test similar to the test in *North Pacifica, LLC v. City of Pacifica*, 335 F. Supp. 2d 1045 (N.D. Cal. 2004).

> "The party seeking disqualification must show that its present or past attorney's former employee possesses confidential attorney-client information materially related to the proceedings before the court. . . . Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment. . . ."

*Shadow Traffic Network*, 24 Cal. App. 4th at 1084-85, 29 Cal. Rptr. 2d at 703 (quoting *In re Complex Asbestos Litigation*, 232 Cal. App. 3d 572, 283 Cal. Rptr. 732 (1991)). The test served to "implement the important public policy of protecting against the disclosure of confidential information and the potential exploitation of such information by an adversary." *Shadow Traffic Network*, 24 Cal. App. 4th at 1085, 29 Cal. Rptr. at 703.

Using the test described in *North Pacifica, LLC*, the special master proceeded to determine whether O'Neil obtained confidential information from Horizon's counsel and, if he did, whether he disclosed such information to Lansing's counsel. Implicit in the test applied by the special master was the

finding by the Respondent that Horizon reasonably believed that the information it conveyed to O'Neil would be kept confidential. We approve the special master's use of this test. A rebuttable presumption of shared confidences should be applied to a side-switching expert. The party requesting a disqualification of counsel that subsequently retained the expert must establish that it reasonably believed that information it conveyed to the expert would be kept confidential and that it conveyed confidential information to the expert. If this is shown, the presumption arises that this information was conveyed by the expert to counsel that subsequently retained the expert. Counsel must rebut this presumption by proving that he or she did not receive confidential information from the expert. If the presumption is not rebutted, the court should determine whether continued representation by counsel will taint further proceedings.

Horizon had the initial burden to show that it reasonably believed that information conveyed to O'Neil would be kept confidential and that it had conveyed confidential information to O'Neil. When Horizon made this showing, it created the rebuttable presumption that O'Neil conveyed the confidential information to counsel for Lansing. To rebut this presumption, Lansing's counsel had to prove that O'Neil did not convey the confidential information to counsel for Lansing.

The special master accepted the factual findings of the Respondent that O'Neil and Horizon had a confidential relationship and O'Neil had confidential information which was conveyed to him by Horizon, but that at no time did O'Neil communicate to Lansing's counsel any of the confidential information. And Horizon's counsel had not advanced any evidence that its trial strategies, work product, or mental impressions had been communicated by O'Neil to Lansing's counsel.

We review the findings of the special master to determine whether such findings are clearly against the weight of the evidence. Recommended factual findings of a special master have the effect of a special verdict, and the report upon questions of fact, like the verdict of a jury, will not be set aside unless clearly against the weight of the evidence. See

*Larkin v. Ethicon, Inc*., 251 Neb. 169, 556 N.W.2d 44 (1996). The special master's finding that O'Neil did not convey the confidential information to Lansing's counsel was not clearly against the weight of the evidence.

Horizon has not shown clearly and convincingly that the Respondent had a legal obligation to disqualify Lansing's counsel. Horizon is not entitled to a writ of mandamus. See *Schropp Indus. v. Washington Cty. Atty.'s Ofc*., 281 Neb. 152, 794 N.W.2d 685 (2011).

## 2. DISTRICT COURT'S ORDER
### DISQUALIFYING O'NEIL

We address one remaining issue, because it is necessary for complete resolution of this matter. The Respondent "sustain[ed] the Motion to Disqualify . . . O'Neil . . . from testifying as an expert witness." The order prohibited O'Neil from testifying but did not expressly prohibit him from consulting with Lansing.

The special master concluded that continued representation by Lansing's counsel did not threaten to taint further proceedings, because O'Neil was disqualified as a testifying expert. The Respondent accepted the testimony of Nesland and Christie that they reasonably believed they had established a confidential relationship with O'Neil and that O'Neil received confidential information. It accepted the testimony of May that O'Neil had not conveyed confidential information to him. O'Neil was disqualified from testifying as an expert witness to protect Horizon's confidential information. If, following his disqualification, O'Neil were to consult with Lansing as a nontestifying expert, the proceedings would be tainted. Therefore, we conclude the order implicitly prohibits all further contact by O'Neil with Lansing and its counsel and disqualifies O'Neil from any further participation in this matter from and after the date of the disqualification order of March 30, 2012.

## VI. CONCLUSION

There is a rebuttable presumption that O'Neil shared confidences gained from Horizon's counsel with Lansing's counsel.

Lansing rebutted this presumption, because the special master determined that O'Neil had not communicated Horizon's confidential information to Lansing's counsel. This finding is not clearly against the weight of the evidence. We adopt this finding, and conclude that because O'Neil did not share confidential information with Lansing or Lansing's counsel, disqualification of Lansing's counsel is not required. Horizon's application for a writ of mandamus is denied.

WRIT OF MANDAMUS DENIED.

MILLER-LERMAN, J., not participating.