Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/15/2017 05:13 PM CDT

Sonia Becher, appellee and cross-appellant,
v. Mark A. Becher, appellant
and cross-appellee.

___ N.W.2d ___

Filed June 6, 2017.    No. A-16-054.

1. **Appeal and Error: Waiver.** Whether a party waived his or her right to
   appellate review is a question of law.
2. **Statutes: Appeal and Error.** To the extent an appeal calls for statutory
   interpretation or presents questions of law, an appellate court must reach
   an independent conclusion irrespective of the determination made by the
   court below.
3. **Judgments: Proof: Waiver: Affidavits: Appeal and Error.** In order
   to establish whether a party has so dealt with a judgment or other order
   appealed from as to have waived any right to review, it is permissible to
   present affidavits foreign to the record thereto.
4. **Judgments: Appeal and Error.** An appellant may not voluntarily
   accept the benefits of part of a judgment in the appellant's favor and
   afterward prosecute an appeal or error proceeding from the part that is
   against the appellant.
5. **Divorce: Judgments: Appeal and Error.** A spouse who accepts the
   benefits of a divorce judgment does not waive the right to appellate
   review under circumstances where the spouse's right to the benefits
   accepted is conceded by the other spouse, the spouse was entitled as
   a matter of right to the benefits accepted such that the outcome of the
   appeal could have no effect on the right to those benefits, or the benefits
   accepted are pursuant to a severable award which will not be subject to
   appellate review.
6. **Verdicts: Evidence: Appeal and Error.** Recommended factual findings
   of a special master have the effect of a special verdict, and the report
   upon questions of fact, like the verdict of a jury, will not be set aside
   unless clearly against the weight of the evidence.

7. **Judgments: Appeal and Error.** Where parties consent that the report of a referee containing the evidence taken by said referee, and his findings of fact and conclusions of law, shall be submitted to the court, together with the objections and exceptions thereto, for determination on the merits by the court, they are precluded by such submission from assigning error by the court in setting aside the report and findings of the referee, and substituting therefor the findings of the court.

8. ____: ____. Where parties consent that the report of a referee containing the evidence taken by said referee, and his findings of fact and conclusions of law, shall be submitted to the court, together with the objections and exceptions thereto, for determination on the merits by the court, an appellate court will only consider the correctness of the findings and judgment of the district court.

9. **Trial: Witnesses: Testimony.** Witness credibility and the weight to be given a witness' testimony are questions for the trier of fact.

10. **Judgments.** A trial court may only set aside or modify the report of a referee issued pursuant to Neb. Rev. Stat. § 25-1129 et seq. (Reissue 2016) upon a determination that the referee's findings were clearly against the weight of the evidence.

11. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

12. ____: ____. Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance.

13. **Divorce: Courts: Property Division.** The manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's ability to determine how the property should be divided in an action for dissolution of marriage.

14. **Divorce: Property Division.** In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held.

15. **Property Division: Proof.** The burden of proof rests with the party claiming that property is nonmarital.

16. **Modification of Decree: Child Support.** The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child.

17. **Rules of the Supreme Court: Child Support.** In general, child support payments should be set according to the Nebraska Child Support Guidelines.

18. **Child Support.** Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned.

19. **Child Support: Evidence.** Generally, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts.

20. **Child Support.** In calculating child support, the court must consider the total monthly income, defined as income of both parties derived from all sources.

21. **Divorce: Alimony.** In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

22. ____: ____. In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), a court should consider the income and earning capacity of each party and the general equities before deciding whether to award alimony.

23. **Divorce: Property Division: Alimony.** The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately.

24. **Property Division.** The purpose of a property division is to distribute the marital assets equitably between the parties.

25. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in Neb. Rev. Stat. § 42-365 (Reissue 2016) make it appropriate.

26. **Divorce: Alimony.** In weighing a request for alimony, the court may take into account all of the property owned by the parties when entering the decree, whether accumulated by their joint efforts or acquired by inheritance.

27. **Divorce: Attorney Fees.** In a marital dissolution action, an award of attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation.

28. ____: ____. A dissolution court deciding whether to award attorney fees should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Lancaster County: Steven D. Burns, Judge. Affirmed as modified.

David P. Kyker and Brad Sipp for appellant.

Sally A. Rasmussen, of Mattson Ricketts Law Firm, for appellee.

Moore, Chief Judge, and Riedmann and Bishop, Judges.

Moore, Chief Judge.

## I. INTRODUCTION

In this dissolution of marriage action, the parties agreed to trial before a referee. The referee's report was filed with the district court for Lancaster County, and the parties filed exceptions to the report. The court subsequently entered a decree of dissolution from which the parties have appealed. Mark A. Becher assigns error to the manner in which the district court reviewed and modified the referee's report. Mark challenges certain findings of the court regarding the classification, valuation, and division of the parties' assets and debts; custody and parenting time; child support; alimony; and attorney fees. In her cross-appeal, Sonia Becher assigns error to the court's allocation of Christmas holiday parenting time and the court's failure to classify certain property as nonmarital. Sonia also seeks summary dismissal of Mark's appeal based upon Mark's acceptance of the benefits of the decree. For the reasons that follow, we affirm as modified, vacating and setting aside certain findings of the district court.

## II. BACKGROUND

The parties were married in December 1991. They have three children: Daniel Becher, born in 2000; Cristina Becher, born in 2002; and Susana Becher, born in 2008.

On February 1, 2013, Sonia filed a complaint for dissolution of marriage in the district court, and Mark thereafter filed an answer. Both parties sought custody of the children, child support, alimony, attorney fees, and an equitable division of the parties' property.

The parties entered into a stipulation with respect to temporary matters. On April 19, 2013, the district court approved the stipulation and awarded the parties temporary joint legal custody of the children. Temporary physical custody of the children was awarded to Sonia, subject to Mark's rights of parenting time as set forth in the attached parenting plan. The court ordered Mark to pay temporary child support of $4,000 per month beginning May 1 and spousal support of $6,000 per month. The court also ordered Mark to pay the "school tuition and matriculation fees" for the minor children to attend a particular elementary school and temporary attorney fees on behalf of Sonia of $2,000.

Soon thereafter, Mark filed a motion to modify both temporary custody and support. In his motion, Mark alleged that Daniel's primary physical custody had been maintained with Mark since May 2013. Mark alleged that the temporary child support award should be adjusted to reflect this split custody arrangement. Mark also alleged that the children were attending a different school than that contemplated in the April 2013 temporary order, at a significantly higher cost, and that "[s]upport should be adjusted to reflect the increased education expense."

On November 25, 2013, the district court entered another temporary order. The court awarded Mark temporary custody of Daniel and awarded Sonia parenting time with Daniel. The court denied Mark's motion for a reduction in his child support obligation and reserved that issue for trial. The court

also ordered the parties to complete a custody evaluation by a psychologist, with each party paying one-half of any necessary expenses.

On December 10, 2014, the parties filed a stipulation agreeing to a trial before a referee due to the complex financial and business valuation issues involved in their divorce as well as the issues of parenting time, child support, and alimony. The district court approved the stipulation and appointed a referee.

Trial was held before the referee on multiple dates from December 11, 2014, to July 23, 2015. The voluminous trial record contains more than 2,300 pages of testimony and nearly 200 exhibits. We have set forth the evidence relevant to the parties' assignments of error in the corresponding sections below.

On October 20, 2015, the referee's report and the parties' exceptions thereto were filed with the district court. The referee's detailed and thorough report is 34 pages, excluding the attached parenting plan, child support worksheets, and spreadsheet of the property valuation and division. We have discussed specific findings of fact, analyses, and recommendations made by the referee as necessary in the analysis section below.

On November 4, 2015, the district court received into evidence the transcribed trial testimony and exhibits from the trial before the referee for purposes of reviewing the record. The court heard Sonia's arguments in support of her exceptions to the referee's report. Mark withdrew his exceptions to the referee's report, but he asked the court to modify the payment schedule for the equalization payment to Sonia. Mark's counsel informed the court that Mark was "am[en]able to having joint custody of his children" but asked the court to change his support obligation accordingly if joint custody was awarded. Finally, he asked the court "to adopt the report with the exception that [he] believe[d] that the court may fashion a different parenting plan or one that the court believes is more in the best interest of these children."

On December 21, 2015, the district court entered a detailed 25-page decree. We have discussed specific findings in the decree in the analysis section below.

Mark filed a motion to determine supersedeas bond. On January 26, 2016, the district court entered an order finding that during the pendency of any appeal by either party, each party shall manage, operate, and control the real estate awarded to that party pursuant to the decree and be entitled to collect and receive all rents due and payable with regard to the real estate awarded. The court also found that during the pendency of any appeal, Sonia shall be entitled to collect and receive all rents due and payable with regard to the three commercial properties awarded to her and each party shall service the debt obligation on the real estate allocated in the decree. Finally, the court found that upon Mark's posting a supersedeas bond of $600,000 to be approved by the court, Mark shall not be required during the pendency of any such appeal to transfer to Sonia any ownership interest he might have in the real estate awarded to Sonia. The record does not show that Mark ever filed a supersedeas bond.

On July 1, 2016, after Mark had perfected his appeal, Sonia filed a motion for summary dismissal of Mark's appeal with this court. She asserted that Mark had accepted the benefits of the decree and had forfeited his right to appeal all issues except those pertaining to the children. We overruled Sonia's motion without prejudice, and we have addressed the issue of acceptance of the benefits in this opinion. On December 14, just prior to oral argument in this case, Sonia filed a renewed motion to dismiss, and we address Sonia's renewed motion as well in the analysis section below.

## III. ASSIGNMENTS OF ERROR

Mark asserts, restated, that the district court erred in (1) modifying the referee's report without determining whether the referee's findings were clearly against the weight of the evidence; (2) setting aside certain property to Sonia as

nonmarital; (3) awarding Sonia three commercial properties; (4) valuing Sark Tile, Inc., Lamp & Lighting of Lincoln, Inc. (Lamp & Lighting), and Grab It Hardware; (5) dividing the parties' personal property; (6) treating Sark Tile's shipping containers as personal property; (7) determining marital debt; (8) setting forth conflicting custodial arrangements for Susana; (9) determining the parties' incomes for purposes of child support; (10) failing to prepare a "worksheet 3" in calculating child support; (11) improperly crediting Mark for overpayment of temporary child support; (12) requiring Mark to pay private school tuition; (13) awarding alimony; and (14) awarding attorney fees.

On cross-appeal, Sonia asserts that the district court erred in (1) allocating parenting time over the Christmas holiday; (2) failing to characterize a life insurance policy purchased by Sonia's father as nonmarital; and (3) failing to award her nonmarital equity in Capitol Park, LLC, Lamp & Lighting, and certain residential rental property.

## IV. ANALYSIS

### 1. SONIA'S MOTIONS TO DISMISS

[1,2] Before addressing the merits of Mark's assigned errors on appeal, we first address whether he waived his right to appeal from the decree by accepting the benefits of the judgment. Whether a party waived his or her right to appellate review is a question of law. *Edwards v. Edwards*, 16 Neb. App. 297, 744 N.W.2d 243 (2008). To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below. *Devney v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016).

[3] Although Mark has not argued that Sonia has waived her right to cross-appeal, for the sake of completeness, we have also addressed the effect of Sonia's acceptance of certain benefits on her right to cross-appeal. In addressing the issue of acceptance of benefits by the parties, we have reviewed

both of Sonia's motions to dismiss and her supporting affidavits. The Nebraska Supreme Court has held that in order to establish whether a party has so dealt with a judgment or other order appealed from as to have waived any right to review, it is permissible to present affidavits foreign to the record thereto. See *Phelps v. Blome*, 150 Neb. 547, 35 N.W.2d 93 (1948).

### (a) Sonia's First Motion to Dismiss

In the affidavit in support of her first motion to dismiss, Sonia stated that following entry of the decree and Mark's failure to post a supersedeas bond, she and Mark both took full ownership and control over the residential and commercial properties awarded to them by the district court. She stated that during the appeal, the parties have executed and recorded quitclaim deeds transferring their ownership interests in each other's properties. Sonia also stated that Mark has created a new corporation, John Galt Development, LLC, which now holds title to the properties awarded to him. Sonia attached copies of the quitclaim deeds executed and recorded by the parties and certified copies of the certificate of organization and proof of publication for John Galt Development filed by Mark with the Nebraska Secretary of State. Sonia also stated that Mark had refinanced the loans associated with his properties, releasing her as guarantor and her properties as collateral for those notes. She attached copies of recorded deeds of reconveyance releasing her properties as collateral.

In her affidavit, Sonia stated that during the appeal, Mark has utilized rents and receipts from Sark Tile, one of the businesses awarded to him, to pay personal expenses. She attached documentation showing that checks from Sark Tile had been used to pay postdecree judgments to the district court for garage door openers and for the children's health care expenses.

Finally, Sonia attached additional documents and outlined steps she had taken with respect to the commercial and residential property awarded to her; detailed her attempts to refinance

a loan associated with a building housing a Dollar General store; and stated that, like Mark, she had utilized rents and receipts from the properties awarded to her to pay both business and personal expenses.

### (b) Sonia's Renewed
### Motion to Dismiss

In the affidavit attached to her renewed motion to dismiss, Sonia stated that since submission of her first affidavit, both parties had independently obtained refinancing for those commercial properties awarded to each of them, that a former "blanket loan" which was cross-collateralized by both parties' properties had been satisfied, and that she had renegotiated the terms and conditions for a loan on her commercial properties only and was making the loan payments pursuant to those terms and conditions. Finally, Sonia stated that she had sold Mini Storage, one of the commercial properties awarded to her, in an arm's-length sale to a third party. Sonia stated that she no longer owns any part of Mini Storage and has "no say" in how that business is operated.

### (c) Relevant Case Law

[4] Under the general acceptance of benefits rule, an appellant may not voluntarily accept the benefits of part of a judgment in the appellant's favor and afterward prosecute an appeal or error proceeding from the part that is against the appellant. *Liming v. Liming*, 272 Neb. 534, 723 N.W.2d 89 (2006). There are, however, exceptions to this general rule.

An exception to the acceptance of benefits rule exists where the outcome of the appeal could have no effect on the appellant's right to the benefit accepted. See *Kassebaum v. Kassebaum*, 178 Neb. 812, 135 N.W.2d 704 (1965) (appellant who withdrew $200 from former jointly held account assigned by divorce decree to him not estopped from appealing from decree on ground that property division awarded him was insufficient).

[5] In *Liming v. Liming, supra*, the Nebraska Supreme Court held that in a dissolution action, a spouse who accepts the benefits of a divorce judgment does not waive the right to appellate review under circumstances where the spouse's right to the benefits accepted is conceded by the other spouse, the spouse was entitled as a matter of right to the benefits accepted such that the outcome of the appeal could have no effect on the right to those benefits, or the benefits accepted are pursuant to a severable award which will not be subject to appellate review. The court in *Liming* observed:

> The reasoning for these exceptions is that to preclude appeal by the acceptance of the benefits of a divorce judgment, the acceptance of benefits must be of such a nature as to clearly indicate an intention to be bound by the divorce decree. . . . There must be unusual circumstances, demonstrating prejudice to the appellee, or a very clear intent to accept the judgment and waive the right to appeal, to keep an appellate court from reaching the merits of the appeal.

272 Neb. at 543, 723 N.W.2d at 96-97 (citations omitted).

Given Sonia's arguments in her brief in support of her first motion to dismiss, some discussion of the Nebraska Supreme Court's holding in *Giese v. Giese*, 243 Neb. 60, 497 N.W.2d 369 (1993), is warranted. The holding in *Giese* (along with the holding in *Shiers v. Shiers*, 240 Neb. 856, 485 N.W.2d 574 (1992)), was disapproved of to a certain extent by the court in *Liming v. Liming, supra*, but Sonia argues that the court's holding in *Giese* still has some applicability in the present case.

In *Giese v. Giese, supra*, the wife claimed that the husband waived his right to appeal because he had accepted various aspects of the property settlement, had taken possession of a drycleaning business awarded to him, and had used the drycleaning business' assets to pay personal expenses and satisfy other obligations under the decree. The Nebraska Supreme Court in *Giese* noted its prior rulings in both *Kassebaum* and

*Shiers* and observed that the court-ordered sale of certain joint assets and equal division of the proceeds did not confer a right which did not exist in the parties prior to the judgment and was permitted under *Kassebaum*. However, the *Giese* court determined that the husband's acceptance of the drycleaning business did not fall under the *Kassebaum* exception. The court concluded that in taking sole possession of the drycleaning business, which had been a joint asset of the parties, and using its assets, the husband waived his arguments except for those with respect to child support.

The Nebraska Supreme Court in *Liming v. Liming*, 272 Neb. 534, 723 N.W.2d 89 (2006), characterized the holding in *Giese* as a departure from the exception to the acceptance of benefits rule set forth in *Kassebaum v. Kassebaum*, 178 Neb. 812, 135 N.W.2d 704 (1965). The *Liming* court noted that while it had not previously revisited the holding in *Giese* (and *Shiers*), this court, in *Paulsen v. Paulsen*, 11 Neb. App. 362, 650 N.W.2d 497 (2002) (relying on exception that if outcome of appeal could have no effect on appellant's right to benefit accepted, its acceptance does not preclude appeal), allowed an appellant to challenge an alimony award although the appellant had accepted the benefits of the property settlement. The Supreme Court in *Liming* went on to reiterate the acceptance of benefits rule set forth in *Kassebaum* and stated further, "When there is no possibility that an appeal may lead to a result showing that the appellant was not entitled to what was received under the judgment appealed from, the right to appeal is unimpaired by the acceptance of benefits." 272 Neb. at 542, 723 N.W.2d at 96. The court then held to the extent that *Giese* (and *Shiers*) limit the exceptions to the acceptance of benefits rule in a dissolution of marriage action to issues affecting the interests and welfare of children, they are disapproved.

Sonia argues that while the Nebraska Supreme Court in *Liming* disapproved of *Giese v. Giese*, 243 Neb. 60, 497 N.W.2d 369 (1993), to the extent that it limited exceptions to

the acceptance of benefits rule to issues with respect to children, it did not overturn the *Giese* court's determination that under *Kassebaum*, the husband accepted the benefits of the decree and waived his right to appeal when he took control of the parties' drycleaning business and treated it as his own. In other words, she relies on this determination from *Giese* to support her argument that by taking control of the properties awarded to him in this case and using them as his own, Mark is precluded from appealing all issues except those relating to the parties' children. We disagree. The Nebraska Supreme Court's discussion of the *Kassebaum* exception in *Liming v. Liming, supra*, makes it clear that acceptance of a benefit does not preclude appeal where the outcome of the appeal can have no effect on the appellant's right to the benefit accepted. Here, while Sonia's affidavits support a conclusion that both Mark and Sonia have accepted certain benefits as outlined above, we must examine each party's assignments of error to determine whether the outcome of the appeal with respect to those issues can have any effect on the right to the benefits accepted by that party. If there is no possibility that the appeal of a particular issue will lead to a result showing that party was not entitled to the benefits he or she accepted, that party's right to appeal that issue is not waived. We proceed to consider both party's assignments of error in light of this and the other exceptions set forth above to determine which, if any, issues can be addressed on the merits.

### (d) Issue Relating to Parties'
### Children Not Waived

With respect to the parties' children, Mark asserts that the district court erred in setting forth conflicting custodial arrangements for the parties' youngest child, Susana; determining the parties' incomes for purposes of child support; failing to prepare a "worksheet 3" in calculating child support; improperly crediting Mark for overpayment of temporary child support; and requiring Mark to pay private school tuition. By

his assumption of control and ownership of the properties awarded to him, Mark has not waived his right to appeal these issues. See *Reynek v. Reynek*, 193 Neb. 404, 227 N.W.2d 578 (1975). Likewise, by Sonia's assumption of control and ownership of the properties awarded to her, she has not waived her right to cross-appeal the district court's allocation of parenting time over the Christmas holiday, because that is an issue affecting the children's interests.

### (e) Other Issues Not Waived

Mark asserts that the district court erred in its valuation of Sark Tile, Lamp & Lighting, and Grab It Hardware. Sonia does not challenge the award of these properties to Mark, and his alleged error with respect to the valuation of these properties could have no effect on his right to the ownership and operation of Sark Tile and Lamp & Lighting (Grab It Hardware closed in 2014). Mark has not waived his right to appeal the issue of the valuation of these businesses.

Similarly, Mark has not waived his right to appeal the district court's division of the parties' personal property or the court's treatment of Sark Tile's shipping containers as personal property. Sonia has not challenged these awards on cross-appeal, and the outcome of this appeal with respect to those issues can have no effect on Mark's assumption of ownership and use of the business, residential, and commercial properties awarded to him.

Mark asserts that the district court erred in setting aside the mortgage payoff on the marital residence to Sonia as non-marital property. Although he signed a quitclaim deed with respect to the marital residence, his doing so is not inconsistent with his position with respect to the mortgage payoff. In this assignment of error, Mark does not challenge the award of the marital residence to Sonia; rather, he challenges the court's determination that Sonia was entitled to this particular set off of nonmarital funds gifted by her father. Mark has not waived his right to appeal this issue.

Mark asserts that the district court erred in determining marital debt with respect to "$150,000.00 in loans made to Mark from Craig Smith," brief for appellant at 67, and loans relating to Sark Tile and the Dollar General building. We determine that Mark has not waived his right to appeal the determination of marital debt to the extent he is asking that these debts be included in the overall division of the marital estate.

Finally, Mark has not waived his right to appeal the awards of alimony and attorney fees, which awards Sonia has not challenged on cross-appeal. Again, the outcome of this appeal with respect to the awards of alimony and attorney fees can have no effect on Mark's assumption of ownership and use of the business, residential, and commercial properties awarded to him.

On cross-appeal, Sonia asserts that the district court erred in failing to characterize a life insurance policy purchased by her father as nonmarital. The court included the life insurance policy in the marital estate and awarded it to Sonia at a cash value of $104,600. Mark does not challenge the award of the life insurance policy to Sonia, and her assumption of full ownership and control of the residential and commercial properties awarded to her can have no effect on the issue of whether the policy should have been included in the marital estate. Sonia has not waived the right to cross-appeal this issue.

Sonia also asserts that the district court erred in failing to award her nonmarital equity in Capitol Park, Lamp & Lighting, and certain residential rental property. She signed quitclaim deeds with respect to Capitol Park and the residential rental property identified in this assignment of error. She also signed quitclaim deeds with respect to certain other real property not identified in this assignment of error. Sonia's signing of the quitclaim deeds with respect to the relevant residential rental property and Capitol Park is not inconsistent, however, with her position on cross-appeal. Sonia does not directly challenge the award to Mark of the assets identified in this assignment of error; rather, she argues that she traced certain funds gifted

from her father to these assets and was thus entitled to some
sort of compensation for the traced nonmarital funds. Sonia has
not waived her right to cross-appeal this issue.

### (f) Issues Waived by Mark

Mark asserts that the district court erred in awarding Sonia
three commercial properties, namely, the Dollar General build-
ing, Sun Valley, and Mini Storage. Mark signed a quitclaim
deed transferring to West O Development, LLC, his interest
in the Dollar General building. West O Development was
awarded to Sonia by the district court. Mark also signed a
quitclaim deed transferring his interest in Sun Valley and
Mini Storage to Sonia as trustee of the Becher Trust. Mark's
voluntary signing of the quitclaim deeds evidences an intent
to be bound by the decree with respect to the award of these
properties to Sonia, and he has thus waived his right to appeal
this award. See *Liming v. Liming*, 272 Neb. 534, 723 N.W.2d
89 (2006). However, Mark has not waived the right to appeal
the district court's determination that the West O Development/
Dollar General building should be set aside to Sonia as her
nonmarital property. Mark's position that this asset should be
considered as marital property does not affect Sonia's receipt
of this asset; rather, it impacts the final division of the marital
estate and the amount of the monetary judgment.

### 2. REVIEW OF REFEREE'S REPORT

Mark asserts that the district court erred as a matter of law
or otherwise abused its discretion in reviewing and modifying
the referee's report without determining whether the referee's
findings were clearly against the weight of the evidence.

We first note Sonia's argument that Mark cannot appeal
from the referee's report because he withdrew his exceptions.
See *Corn Belt Products Co. v. Mullins*, 172 Neb. 561, 110
N.W.2d 845 (1961) (where no exceptions are filed to findings
of fact of referee prior to confirmation by trial court, findings
of fact are binding on all parties). However, to the extent that

the court's decree altered the referee's findings, Mark is not prohibited from appealing those changes in the decree.

The parties in this case stipulated to trial before a referee, in accordance with Neb. Rev. Stat. § 25-1129 (Reissue 2016), which provides, "All or any of the issues in the action, whether of fact or law, or both, may be referred to a referee upon the written consent of the parties or upon their oral consent in court entered upon the journal." With respect to trial before a referee, Neb. Rev. Stat. § 25-1131 (Reissue 2016) provides:

> The trial before referees is conducted in the same manner as a trial by the court. They have the same power to summon and enforce the attendance of witnesses, to administer all necessary oaths in the trial of the case, and to grant adjournments, as the court upon such trial. They must state the facts found and the conclusions of law, separately, and their decision must be given, and may be excepted to and reviewed in like manner. The report of the referees upon the whole issue stands as the decision of the court, and judgment may be entered thereon in the same manner as if the action had been tried by the court. When the reference is to report the facts, the report has the effect of a special verdict.

Mark's first assignment of error asks this court to consider whether the district court erred by making its own findings without first explicitly determining that the referee's findings were clearly against the weight of the evidence.

[6] The Nebraska Supreme Court has previously addressed a standard of review for reports on factual recommendations from a special master appointed by the court. *Mid America Agri Products v. Rowlands*, 286 Neb. 305, 835 N.W.2d 720 (2013), involved a mandamus action in which the defendant sought disqualification of the plaintiff's counsel in the underlying civil case on the ground that plaintiff's counsel had retained an expert witness who, before being retained, had consulted with the defendant's counsel on the same matter. In

the mandamus action, the Nebraska Supreme Court appointed a special master who made factual findings about the relationships and communications involved in the dispute. The Supreme Court stated:

> We review the findings of the special master to determine whether such findings are clearly against the weight of the evidence. Recommended factual findings of a special master have the effect of a special verdict, and the report upon questions of fact, like the verdict of a jury, will not be set aside unless clearly against the weight of the evidence.

*Id.* at 320, 835 N.W.2d at 731. The Supreme Court determined that the special master's finding that the expert witness did not convey the confidential information at issue to the plaintiff's counsel was not clearly against the weight of the evidence.

The Nebraska Supreme Court applied this same standard of review in considering the factual findings of a special master it had appointed in *Larkin v. Ethicon, Inc.*, 251 Neb. 169, 556 N.W.2d 44 (1996). In that case, the plaintiff appealed from a trial court decision granting summary judgment in favor of the defendant. Before oral argument, the Supreme Court appointed a special master to take evidence on the issue of the defendant's conduct during discovery and make recommended factual findings. On appeal, the Supreme Court considered the special master's findings in determining whether to reverse the summary judgment and remand the cause for further proceedings. The court noted that recommended factual findings of a special master are given the effect of a special verdict, and the report upon questions of fact, like the verdict of a jury, will not be set aside unless clearly against the weight of the evidence. *Id.* The court determined that the special master's factual findings were not clearly against the weight of the evidence and adopted those findings before proceeding to consider whether summary judgment had been properly entered.

While *Mid America Agri Products* and *Larkin* involved the Nebraska Supreme Court's review of factual findings of

a special master appointed directly by the Supreme Court, in *Brown v. O'Brien*, 4 Neb. 195 (1876), the Supreme Court reviewed a referee's factual findings after trial before the referee and confirmation of the referee's report and dismissal of the case by the trial court. In that case, which involved a contract dispute over a partnership with respect to certain cattle and grain, all issues of both fact and law were referred to and tried before a referee. The plaintiff took several exceptions to the report which were overruled by the trial court. The trial court confirmed the referee's report and dismissed the case. On appeal, the Supreme Court in *Brown* noted:

> The referee who finds there is no partnership between [the plaintiff and one of the defendants] in the grain in controversy, has heard the witnesses and is the best judge as to what the truth of the matter really is. The report is only to be set aside when the finding is clearly against the weight of the evidence.

4 Neb. at 198. The Supreme Court determined that the main question for its consideration was whether the plaintiff's exceptions were well taken. The Supreme Court observed, "As to all the questions of fact, submitted to the referee, his report thereupon must have the same effect and be treated in all respects as the verdict of a jury." *Id.* at 199. The Supreme Court further observed, "The court has no right to set it aside unless it be manifestly against the weight of the evidence." *Id.* After reviewing the evidence, the Supreme Court found nothing to support reversal and affirmed.

[7,8] The Nebraska Supreme Court also considered a trial court's findings with respect to a referee's report in *Hodges v. Graham*, 71 Neb. 125, 98 N.W. 418 (1904). In that case, the parties consented to trial before a referee. The referee filed a report containing his findings of fact and conclusions of law, which were in favor of the plaintiff. The defendant filed objections to the referee's report and a motion for new trial, after which the trial court set aside the referee's findings of fact and conclusions of law and awarded a new trial. The subsequent

proceedings are somewhat confusing, but apparently the parties eventually decided against having a new trial and agreed to resubmit the matter to the trial court on the evidence previously taken before the referee and to have the trial court make findings on the merits as it deemed proper. Subsequently, the trial court again set aside the referee's findings and conclusions and entered its own findings in favor of the defendant. In setting aside the referee's findings, the trial court found that the referee's findings were contrary to the clear weight of the evidence. On appeal, the Nebraska Supreme Court determined that because the parties had in fact agreed that the trial court should make its own findings upon the evidence previously submitted, the only issue for its consideration was whether the trial court erred in its findings and judgment. The Supreme Court held:

> Where parties consent that the report of a referee, containing the evidence taken by said referee and his findings of fact and conclusions of law, shall be submitted to the court, together with the objections and exceptions thereto, for determination on the merits by the court, they are precluded by such submission from assigning error by the court in setting aside the report and findings of the referee and substituting therefor the findings of the court.

71 Neb. at 125, 98 N.W. at 418 (syllabus of court). The Supreme Court further held, "In such case this court will only consider the correctness of the findings and judgment of the district court." *Id*. at 126, 98 N.W. at 418 (syllabus of court).

In our research, we have found no cases where the Nebraska Supreme Court has considered whether a trial court must explicitly determine that the findings in a referee's report are clearly against the weight of the evidence before making its own contrary findings. Mark cites to a Florida case, which is helpful to our consideration of this issue. In *Kalmutz v. Kalmutz*, 299 So. 2d 30 (Fla. App. 1974), a Florida District Court of Appeals reviewed a trial court's (chancellor's) actions

with respect to several findings in a referee's (special master's) report of findings of fact, conclusions of law, and recommendations to the court in a dissolution of marriage action. In that case, the chancellor appointed a special master to take evidence and report his findings of fact, conclusions of law, and recommendations to the court. The husband filed exceptions to the master's report, and after the chancellor entered a final judgment which made certain changes to the master's recommendations, the wife appealed.

On appeal, the *Kalmutz* court first reviewed an earlier case from the Florida Supreme Court with respect to a chancellor's actions in overruling a master:

"While it cannot be questioned that in a case where the chancellor has appointed a master and empowered him to make findings he may override or modify them in any manner consistent with the justice of the case, he may not do this except for good cause. We interpret 'good cause' to mean a showing that the findings of fact by the master were clearly erroneous.

"From our study of the subject it seems to us logical, if the master has heard all the testimony, that an exceptant to his findings undertakes the burden of showing that the master has clearly made a mistake—in other words, the same burden as an appellant who challenges in this court the conclusions of fact reached by the chancellor who has heard the witnesses. After all the master acts as an agent of the chancellor, and what he does in the capacity is in effect done by the court. These recommendations should be set aside only upon good cause, even though the findings were . . . advisory. . . .

"In fine [sic], we have the view that where, as in this case, a competent master is selected by the chancellor and attentively conducts the hearings, thoroughly digests the testimony of the witnesses, and arrives at conclusions which are logical and well supported, his findings, although advisory, should not be set aside arbitrarily or

capriciously (of which there is no claim in this case) nor
should they be disregarded or overruled by the chancellor
simply because of an opinion of the chancellor at variance
with that of the master. As we have said, the master was
acting as an accredited agent of the chancellor and was
at the time performing a service which would have been
performed by the chancellor himself but for the appoint-
ment. Having seen and heard the witnesses, he had a defi-
nite advantage over the chancellor, who reviewed the case
from a typewritten record."

*Kalmutz v. Kalmutz*, 299 So. 2d 30, 33-34 (Fla. App. 1974),
quoting *Harmon v. Harmon*, 40 So. 2d 209 (Fla. 1949) (cita-
tions omitted).

The appellate court in *Kalmutz* then reviewed the master's
findings and recommendations, the transcribed testimony, the
exceptions to the master's report, and the chancellor's order.
After doing so, the appellate court concluded that the master's
findings were not shown to be clearly erroneous. The appellate
court in *Kalmutz* determined:

While a chancellor's view of the evidence may be at
variance with the master such a variance or difference of
opinion is not sufficient to override or modify the mas-
ter's report absent a showing "that the findings of fact
made by the master were clearly erroneous". Accordingly,
as hereinafter delineated, in those instances where there
was competent substantial (although conflicting) evidence
to support the findings of the master his findings must
be sustained and the order of the chancellor vacated and
set aside.

299 So. 2d at 34.

The appellate court then determined whether there was
competent substantial evidence to support each of the four
findings made by the master. The chancellor had modified
three of the master's findings and made no reference to the
fourth finding in its order. The appellate court found that with
respect to two of the modified findings, the chancellor had

based its modification on a view of the evidence at variance with the master's. With respect to those two findings, the appellate court found evidence to support the master's findings. With respect to the third finding modified by the chancellor, the appellate court found the evidence did not support the master's determination, which was thus clearly erroneous, giving the chancellor the power to override the recommendation. Based on the record before it, the appellate court was not prepared to make a determination with respect to the master's fourth finding, which dealt with a contempt issue. Accordingly, the appellate court remanded that issue to the chancellor to "make specific findings." *Id.* at 35.

[9] In the present case, the district court made some references in the decree to the referee's findings and in several instances, the district court's findings follow those of the referee word for word. The court, however, made numerous findings that differed from those of the referee. In those instances, the court did not specifically determine that the referee's findings were clearly against the weight of the evidence. Rather, the district court essentially conducted a de novo review, substituting its view of the evidence in making its determination. In addition, the court made numerous explicit findings with respect to the weight and credibility of certain testimony from the parties, despite the fact that the court did not have the benefit of seeing and hearing the witnesses as did the referee. Generally, witness credibility and the weight to be given a witness' testimony are questions for the trier of fact. *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012). See, also, *Stutzman v. Bates*, 118 Neb. 520, 225 N.W. 678 (1929) (finding of referee on fairly conflicting evidence is binding on appellate court); *Creedon v. Patrick*, 3 Neb. (Unoff.) 459, 91 N.W. 872 (1902) (appellate court declined to reach independent conclusion where evidence before referee was conflicting, referee's report had been confirmed by trial court, and appellate court found sufficient evidence to sustain referee's findings).

[10] We conclude that the district court erred in failing to apply the correct standard of review with respect to the referee's report. We hold that a trial court may only set aside or modify the report of a referee issued pursuant to Neb. Rev. Stat. § 25-1129 et seq. (Reissue 2016) upon a determination that the referee's findings were clearly against the weight of the evidence.

We have reviewed the referee's findings, the parties' exceptions, and the court's decree to determine which of the parties' assigned errors relate to matters in which the district court made findings inconsistent with those of the referee. In those instances, we will determine whether the relevant findings of the referee were clearly against the weight of the evidence. The evidence in this case was conflicting. We consider the fact that the referee saw and heard the witnesses and observed their demeanor while testifying, and we will give great weight to the referee's determinations as to credibility. The district court clearly had its own strong feelings about the witnesses' credibility in this case, but we determine that the district court's differing view of the evidence is not sufficient to override the referee's view of the evidence absent a showing that the referee's findings were clearly against the weight of the evidence. In those instances where there was competent substantial, but conflicting, evidence to support the referee's findings, the differing findings of the district court must be vacated and set aside.

### 3. Classification and Division of Marital Estate

[11] Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or non-marital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate

between the parties in accordance with the principles contained in § 42-365. *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016).

[12-15] Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Id.* Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* The manner in which property is titled or transferred by the parties during the marriage does not restrict the trial court's ability to determine how the property should be divided in an action for dissolution of marriage. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004). The burden of proof rests with the party claiming that property is nonmarital. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016).

(a) Sonia's Nonmarital Property

Mark asserts that the district court erred in setting aside certain property to Sonia as nonmarital. Sonia asserts that the district court erred in failing to characterize a life insurance policy purchased by her father as nonmarital and in failing to award her nonmarital equity in Capitol Park, Lamp & Lighting, and certain residential rental property.

Evidence was adduced that between 1993 and 2008, Sonia's father made gifts to her of over $1.7 million. Generally, Sonia attempted to trace some of these gifts to assets acquired during the marriage. Mark claimed that all of the money had been commingled with marital property and was untraceable. The referee found that the evidence made it nearly impossible to trace most of the monetary gifts from Sonia's father to current identifiable assets. Sonia filed an exception to the referee's failure to properly credit her for gifts from her family.

### (i) West O Development/Dollar
### General Building

Sonia and her sister purchased the West O Development property in 2005, using a gift from their father of $825,000. Sonia later purchased her sister's interest with funds obtained from a loan. The West O Development entity includes a Dollar General building. Various repairs and improvements to the building were made over the years with additional loans. Although the referee recognized the $825,000 gift to purchase the West O Development/Dollar General building, it found that it did not retain its status as a gift because the equity in the building became encumbered by loans, the building was pledged as security for other loans, and moneys generated during the marriage were invested into the building in order to improve it. The referee awarded West O Development to Mark as a marital asset at a value of $1,263,950.

The district court, on the other hand, found that the gift of $825,000 was traceable and that the property which now represents the gift was identifiable. The court awarded Sonia this asset as nonmarital property valued at $1,263,950, subject to the existing debt of $610,000. The court found that there was no evidence of marital funds being used for the continued operation of West O Development or that marital resources were used to service the debt. The court also noted that rents developed from the property were sufficient to service the debt. The district court did not discuss the referee's findings or determine that the referee's findings were clearly against the weight of the evidence.

Although Mark has waived his right to assert error with respect to the award of this property to Sonia, he has preserved his argument that the property should be considered marital. The evidence was clearly conflicting on whether marital resources were invested in this entity. As noted by the referee, the testimony of the parties showed that they both borrowed $500,000 and added another $25,000 of their savings in order to buy out Sonia's sister's interest. The referee further noted

Mark's testimony that a significant amount of additional work and money was put into the Dollar General building. The referee also referred to evidence that the building had been pledged as security for several loans. There is evidence in the record to support the referee's finding that the gift of money from Sonia's father to purchase the building did not retain its status as a gift and that the entire value of West O Development should be considered a marital asset. The finding of the referee in this regard is not clearly against the weight of the evidence. The district court erred in determining that this asset should be treated as a nonmarital asset.

### (ii) Mortgage Payoff on
### Marital Residence

Evidence was adduced about another gift made to Sonia from her father in 2008. The referee found this gift of $432,948 was a gift to the marriage and was not intended solely for the use of Sonia. The referee found that even if it was a gift to Sonia, the money was applied to marital debt and spent on marital business activities. Nevertheless, the referee found that the equities involved required some recognition of this gift, and he reduced the fair market value of the marital home awarded to Sonia by one-half of the funds used to pay off the mortgage balance (half of $220,300, or $110,150). The district court, on the other hand, gave Sonia credit for the full $220,300 mortgage payoff on the marital residence. The district court did not discuss the referee's findings or determine that the referee's findings were clearly against the weight of the evidence.

There was evidence in the record to support the referee's finding either that this gift was not intended solely for Sonia ($212,647 of the $455,401 was placed in a certificate of deposit in Mark's name only with the balance of $220,300 being used to pay off the family home mortgage) or that it lost its status as a gift as it was applied to marital debt and spent on marital business activities. The referee's finding was not clearly

against the weight of the evidence. The district court erred in its determination that Sonia is entitled to a credit of $220,300, instead of the credit of $110,150 given by the referee, against the value of the marital home as a gift.

### (iii) Life Insurance Policy

The referee awarded Sonia a life insurance policy as a marital asset valued at $104,600, having determined that any moneys advanced for life insurance payments could not be traced with any certainty. The district court also awarded Sonia this policy at a value of $104,600 and included it as a marital asset in its division ledger. The court did not specifically discuss the policy in its findings regarding the traceability of nonmarital funds. Sonia argues that this asset should have been characterized as nonmarital because her father purchased it for her when she was 17 years old.

Sonia and her father testified that he purchased a life insurance policy for Sonia when she was 17 and that he paid the annual premiums directly to the life insurance company for many years. At some point, however, he stopped making the premium payments directly and began giving Sonia money to make the payments herself. According to Sonia, this money was placed in a joint account with Mark and premiums were paid from this account. However, the record shows that other money was deposited into this account by the parties during the marriage and that other checks were written from this account for the parties' house and living expenses. In other words, there has been a commingling of the money advanced by Sonia's father such that the life insurance policy did not retain its status as a nonmarital asset.

We conclude that the referee's finding that the money advanced for the life insurance premium payments from Sonia's father could not be traced with sufficient certainty was not clearly against the weight of the evidence, and the district court did not err in awarding Sonia the life insurance policy as a marital asset.

### (iv) Nonmarital Equity
### in Certain Property

Sonia asserts that the district court failed to award her nonmarital equity in Capitol Park, Lamp & Lighting, Sark Motors, and certain residential rental property. These assets were awarded to Mark as marital property by both the referee and the district court. Sonia argues that these are "mixed" marital assets and that at least some of their value should be considered nonmarital for which she should be given a credit. Brief for appellee on cross-appeal at 73. Both the referee and the district court found that the evidence was insufficient to trace any gifted money to Sonia to these assets. We agree. The referee's findings in this regard were not clearly against the weight of the evidence, and the district court did not err in affirming this determination.

### (b) Award of Commercial
### Properties to Sonia

As we determined above, Mark has waived his argument that the district court erred in awarding Sonia three commercial properties: West O Development, Sun Valley, and Mini Storage.

### (c) Valuation of Commercial Property

Mark asserts that the district court erred in its valuation of Sark Tile, Lamp & Lighting, and Grab It Hardware.

### (i) Sark Tile

Sark Tile is a corporation owned by the parties. Both the referee and the district court made extensive findings about the valuation of this property and gave differing reasons for reaching their respective valuations. The referee awarded Sark Tile to Mark at a value of $491,353. Sonia filed an exception to the referee's valuation of Sark Tile. The district court awarded Sark Tile to Mark at a value of $570,000. Although the district court referenced the referee's conclusion that the value of Sark Tile was "not less than $540,327," the court did not reference

the referee's final determination of value at $491,353. Nor did
the court find that the referee's finding of the value of this asset
was clearly against the weight of the evidence.

There was significant evidence adduced by both parties
regarding the value of this company, particularly with regard
to the extensive inventory. There were numerous expert valua-
tions submitted into evidence containing analyses of inventory
records, corporate tax returns, and balance sheets. The referee
concluded, after a review of this evidence, that "it remains
nearly impossible for the Referee to know what this business
is worth because of the irreconcilable evidence and testimony
offered by the experts on behalf of Mark and Sonia." Because
of the continuing concerns the referee had about the value of
the Sark Tile inventory, he requested and received permis-
sion to retain an expert to conduct a fair market valuation of
the inventory. After this valuation of the inventory was done,
adjustments to the business valuation were made by the experts
although the valuations continued to vary significantly. After
reviewing the "irreconcilable evidence," the referee determined
that the value of the tile (i.e., inventory) was not less than
$540,327, which he derived by averaging the 2013 tax return
value of the inventory and his expert's appraisal and then
subtracting 20 percent from that amount based upon another
expert's opinion that 80 percent of the inventory is salable,
together with another 10 percent reduction to account for the
normal markup over cost. Incorporating this inventory value
of $540,327 into an expert's adjusted 2013 balance sheet, the
referee determined the value of Sark Tile as an ongoing entity
to be $491,353.

The district court noted that the valuations of this business
ranged from $15,000 to $1,482,664. The court rejected the
inventory figures used by all the experts and arrived at its own
conclusion of the value of the inventory based upon its extrap-
olation of the original cost of products stored in the shipping
containers and the cost of sales information contained in the
corporate tax returns. The court found that the value of Sark

Tile was $570,000. The district court made no reference to the referee's findings in connection with this asset nor did it find that they were clearly against the weight of the evidence.

We conclude that there was sufficient credible evidence to support the referee's findings and that these findings of value of the inventory and business were not clearly against the weight of the evidence. The district court erred in substituting its determination of value for Sark Tile.

### (ii) Lamp & Lighting

Lamp & Lighting is another corporation owned by the parties. Again, both the referee and the district court made numerous findings with respect to this asset. The referee awarded this business to Mark at a value of $107,000. The referee also assigned a loan for Lamp & Lighting of $150,000 to Mark. Sonia filed an exception to the referee's valuation of Lamp & Lighting. The district court, using a somewhat different analysis than the referee, determined the value of Lamp & Lighting to be $257,000. The district court further noted the existence of a $150,000 debt, bringing the net value of Lamp & Lighting to $107,000. The district court did not make a determination that the findings of the referee were clearly against the weight of the evidence.

As was the case with the Sark Tile valuation, both parties provided expert valuation evidence with respect to Lamp & Lighting which differed significantly. Because of the referee's concern about the accuracy of the inventory values of Lamp & Lighting, it requested and received permission to appoint an expert to provide a fair market value of the inventory. The referee rejected this expert's inventory value as essentially being too low but determined that the inventory number on the tax returns was "over-stated." Because of the "irreconcilable [and] conflicting" evidence, the referee valued the inventory at not less than $190,000, which was arrived at by averaging the expert's inventory appraisal with the year-end inventory reported on Lamp & Lighting's 2013 tax return

and deducting 10 percent based upon nonsalable items or the markup that a potential buyer may exclude from an offer to purchase the business. After incorporating the $190,000 value for the inventory into Mark's expert's analysis, the referee determined the value of Lamp & Lighting to be $107,000.

The district court noted that the expert's valuations of Lamp & Lighting varied between $25,001 and $650,000. Similar to its method of valuation of Sark Tile, the court looked at gross sales and costs of goods sold on tax returns to arrive at its value of $257,000. The district court did not determine that the referee's finding of value was clearly against the weight of the evidence.

We conclude that there was sufficient credible evidence to support the referee's value of Lamp & Lighting and that it was not clearly against the weight of the evidence. The district court erred in substituting its own determination of value of this asset.

### (iii) Grab It Hardware

Grab It Hardware was another business owned by the parties; it was closed in 2014. The referee made no findings with respect to this business, and it is not included in the appendix to the report which shows the division of assets and debts. The district court found that at the time of its closing in 2014 (after the valuation date of December 31, 2013), the assets of this business sold for $5,000. The court placed a value of $5,000 for this business and assigned it as a marital asset to Mark. The district court did not determine that the exclusion of this asset from the referee's division of assets was clearly against the weight of the evidence. However, because the referee did not make any findings regarding this business, we find no error by the district court in including the value of $5,000 for this business as a marital asset.

### (d) Division of Personal Property

Mark asserts that the district court erred in dividing the parties' personal property.

The parties presented a significant amount of information concerning personal property. The referee made extensive findings and a detailed division of the parties' personal property. The referee awarded Sonia personal property valued at $13,340. The referee awarded Mark certain personal property valued at $7,470 and certain undervalued personal property in Sonia's possession valued at $9,650, as well as other personal property ("[p]ing pong table"; "[f]oosball table"; pool table, cues, and rack; compressor; and "Yamaha ATV"), at a total value of $4,375. The referee also awarded Mark "sentimental and pre-marital items" valued at $0. The total value of the personal property awarded to Mark by the referee was $21,495. Sonia filed an exception to the referee's valuation of the personal property and to the referee's overall allocation of the marital estate. The district court adopted the referee's allocation of personal property, "with a few minor modifications." The district court valued the personal property awarded to Sonia at $27,365 and to Mark at $23,870. It is next to impossible to determine the reason for the different valuations. The district court did not determine that the referee's findings were clearly against the weight of the evidence. We conclude that the district court erred in substituting its own valuation and division of personal property for that of the referee.

### (e) Sark Tile's Shipping Containers

Mark asserts that the district court erred in treating Sark Tile's shipping containers as personal property. There was evidence adduced about the containers in which the tile sold by Sark Tile was delivered. The referee did not separately value the containers. Sonia filed an exception to the failure to include the containers in the division of property. The district court awarded to Mark, as personal property, 74 containers used by Sark Tile that existed as of the end of 2013 and all containers acquired since that date. In its division worksheet, the district court valued the 74 containers at $61,152. Mark argues on appeal that it was error to treat the containers as personal assets

because they were a corporate asset of Sark Tile. The district court did not determine that the referee's failure to separately value the containers owned by Sark Tile was clearly against the weight of the evidence.

In reviewing the district court's valuation of Sark Tile, it is evident that the court focused exclusively on the value of inventory as opposed to the overall value of the business; whereas the referee incorporated the inventory value into the overall value of the business. We conclude that there was sufficient evidence to support the referee's valuation of the Sark Tile business without separately valuing the containers owned by the business and that this valuation was not clearly against the weight of the evidence. The district court erred in including a separate value for the Sark Tile containers in its division of marital assets.

### (f) Marital Debt

Mark asserts that the district court erred in determining marital debt. The referee assigned to Mark all of the marital debt, with the exception of the accrued real estate taxes on the family home after December 31, 2013, which it treated as a postseparation debt assigned to Sonia. The referee valued the total liabilities assigned to Mark at $2,856,658.30. The district court, as mentioned previously, assigned $610,000 of debt on the West O Development property to Sonia. In addition, it assigned a debt of $12,347 to Sonia associated with an unimproved parcel of real estate awarded to her. The district court's recapitulation shows total debt assigned to Mark as $2,236,544.18. The difference from the referee's value of debt assigned to Mark very closely relates to these two debts.

Mark challenges the failure to include certain debts in the marital estate. He first challenges the failure to include "$150,000.00 in loans made to Mark from Craig Smith." Brief for appellant at 67. However, the referee did not include these loans in the marital estate, noting that they were "Post-separation." The district court made the same

determination. Although we earlier determined that Mark did not waive his challenge to the classification of these debts, because Mark withdrew any exceptions he had to the referee's findings regarding these loans and the district court did not modify the referee's report in this regard, he is not allowed to challenge this now on appeal.

Mark also argues that the district court failed to include two other specific loans from "Security First" to Sark Tile totaling $250,000. Because the referee and the district court listed the debts in different ways, it is difficult to determine whether the district court's assignment of debts to Mark differed from the referee's determination of debts. However, as noted above, the difference in the assignment of debts is essentially explained by the assignment to Sonia of the indebtedness related to West O Development and the debt regarding the unimproved lot. Because Mark withdrew his exception to the referee's division of debts, we conclude that he is precluded from assigning error to the district court's determination of marital debt. However, as determined above, Mark was not precluded from assigning error to the district court's treatment of West O Development as nonmarital property, with the corresponding assignment of $610,000 of associated debt to Sonia, which we addressed above.

### (g) Conclusion

The district court awarded Sonia marital property totaling $1,843,409 and marital debt totaling $12,347. The court also set aside $1,263,950 to Sonia as her nonmarital interest in West O Development, with the corresponding debt of $610,000, and further set aside $220,300 as her nonmarital portion of the family home. The court awarded Mark marital property totaling $4,906,406 and marital debt totaling $2,086,544.18. As set forth above, we have found certain errors in the district court's classification, valuation, and division of the marital estate, and we vacate and set aside those portions of the decree and modify the distribution of the marital estate in the decree accordingly

to incorporate the findings of the referee as to those issues. The following is a summary of our conclusions:

- The district court erred in its determination that the West O Development/Dollar General building should be treated as a nonmarital asset. Accordingly, Sonia's award of marital property increases by $1,263,950, and the amount of marital debt awarded to her increases by $610,000.
- The district court erred in its determination that Sonia is entitled to a credit of $220,300 against the value of the marital home as a gift as opposed to the $110,150 credit given by the referee. Accordingly, the marital property awarded to Sonia increases by $110,150.
- The district court erred in substituting its determination of Sark Tile's value for that of the referee. Accordingly, the value of the marital property awarded to Mark decreases by $78,647 (difference between court's value of $570,000 and referee's value of $491,353).
- The district court erred in substituting its own determination of Lamp & Lighting's value for that of the referee. Accordingly, the value of the marital property awarded to Mark decreases by $150,000 (difference between court's value of $257,000 and referee's value of $107,000).
- The district court erred in substituting its own valuation and division of personal property for that of the referee. Accordingly, the value of the marital property awarded to Mark decreases by $2,375 (difference between court's value of $23,870 and referee's value of $21,495) and the value of the marital property awarded to Sonia decreases by $14,025 (difference between court's value of $27,365 and referee's value of $13,340).
- The district court erred in including a separate value for the Sark Tile shipping containers in its division of marital assets. Accordingly, Mark's award of marital property decreases by $61,152.
- Finally, as discussed further below, we determine that the district court erred in modifying the amount of credit to be

given to Mark for his child support payments. Accordingly, he is to receive a credit on his child support payment of $30,184 as determined by the referee (instead of the credit of $13,512 given by the court).

The following table represents our modifications to the district court's distribution:

## MARITAL PROPERTY DISTRIBUTION

|  | Sonia | Mark |
| --- | --- | --- |
| District court's net marital distribution | $1,831,062.00 | $2,819,861.82 |
| West O Development |  | 1,263,950.00 |
| First Security Bank loan on West O Development |  | (610,000.00) |
| Increase due to error in amount of gift credit on marital home |  | 110,150.00 |
| Decrease in value of Sark Tile |  | (78,647.00) |
| Decrease in value of Lamp & Lighting |  | (150,000.00) |
| Decrease in value of personal property | (14,025.00) | (2,375.00) |
| Decrease due to error in valuing shipping containers |  | (61,152.00) |
| Modified Net Marital Distribution | $2,581,137.00 | $2,527,687.82 |

### Equalization Payment Due

| | |
| --- | --- |
| Difference in net marital distribution credit to Mark (one-half of $53,449.18) | $26,724.59 |
| Ski trip credit to Mark | 2,000.00 |
| Child support payment credit to Mark | 30,184.00 |
| Balance to be paid from Sonia to Mark | $58,908.59 |

We therefore modify the decree to require Sonia to pay Mark as equalization the sum of $58,908.59, payable within 90 days of the entry of the mandate in the district court.

### 4. Errors Relating to
### Parties' Children

#### (a) Custody

Mark asserts that the district court erred in setting forth conflicting custodial arrangements for the parties' youngest child, Susana.

The referee found that joint legal custody of all three children was in their best interests, with Mark having primary physical custody of Daniel and Sonia having primary physical custody of Cristina and Susana. Based upon the recommendations of a counselor, no set parenting time was established for Daniel and Cristina. The referee set parenting time for Mark with Susana on alternating weekends from Thursday after school to Monday at 8 a.m., together with overnights on Wednesdays on alternating weeks. Sonia filed exceptions with regard to the referee's parenting plan.

The district court determined that "some modifications to the Referee's proposed Parenting Plan designed to reduce potential sources of conflict is in the best interest of the children." The district court then set forth conflicting custody arrangements. In the body of the decree, the court stated that Sonia was awarded legal and physical custody of Cristina and Susana and that Mark was awarded legal and physical custody of Daniel. However, in the parenting plan attached to the decree, the court stated that the parties would share joint legal custody of all the children, with Mark having primary physical custody of Daniel and Sonia having primary physical custody of Cristina. The court stated that the parties would share joint physical custody of Susana. The parenting schedule set by the court did not provide for parenting time for Daniel and Cristina but gave the parties parenting time with Susana on alternating weeks.

The district court made these "modifications" to the referee's parenting plan with regard to custody and parenting time without determining that the referee's findings were clearly

against the weight of the evidence. We conclude that the evidence supported the referee's determination of custody and parenting time and that the district court erred in modifying these findings. We therefore modify the decree to clarify that the parties shall share joint legal custody of all three children, with Sonia to have physical custody of Cristina and Susana and Mark to have physical custody of Daniel. The parenting plan is modified to incorporate the plan attached to the referee's report.

### (b) Christmas Holiday
### Parenting Time

On cross-appeal, Sonia asserts that the district court erred in allocating parenting time over the Christmas holiday.

The referee's parenting plan divided the Christmas break into two periods. The first half of Christmas break is to commence at 6 p.m. on the day the child (only pertaining to Susana at this time) is excused for the Christmas holiday break and concludes at noon the day that constitutes the midpoint of the Christmas holiday break. The second half of Christmas break is to commence at noon the day constituting the midpoint from when the child is released from school for the Christmas holiday break and concludes at 7 p.m. on the day before school is to resume. The parties were awarded these times in alternating years.

The district court in its parenting plan modified the visitation for Susana to alternating weeks with each parent, from Friday to Friday. With respect to Christmas, the court's parenting plan provided that every year the parent who does not have parenting time on Christmas Day as a result of the weekly rotation shall have parenting time on December 24 beginning at noon and ending at 11:30 p.m.

Sonia's complaint with respect to the Christmas holiday parenting time is that the district court's schedule precludes her from taking Susana to Spain to visit extended family. Sonia requested that she have the entire Christmas break

every other year so she could take the children to visit family and that on the years Mark has the children for the entire holiday, she can spend the entire break in Spain with her family. This is the same argument Sonia made to the referee which was rejected. We find no error by either the referee or the district court in failing to alternate the entire Christmas break between the parties. As we determined above, the parenting plan devised by the referee was not clearly against the weight of the evidence and should be incorporated into the court's decree.

### (c) Parties' Income

Mark asserts that the district court erred in determining the parties' incomes for purposes of child support.

[16-20] The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). In general, child support payments should be set according to the Nebraska Child Support Guidelines. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Id.* Generally, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Id.* In calculating child support, the court must consider the total monthly income, defined as income of both parties derived from all sources. Neb. Ct. R. § 4-204 (rev. 2015); *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016). Section 4-204 states: "If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources."

### (i) Mark's Income

At the time of trial, Mark was 46. He has a bachelor's degree in economics and a "M.B.A." degree.

Sark Tile pays Mark an annual salary of $20,000, although he "forewent [his] salary" and only received $15,000 in 2012. As recognized by the referee, determining Mark's income from the tax returns was "all but impossible" because there were significant personal and family expenses that were being paid through one or more of the parties' businesses or commercial properties. Both parties utilized expert witnesses to provide an analysis of Mark's annual income. Looking at tax returns and other information, Mark's expert determined that Mark's "Total Personal Cash Flow (Four Year Weighted Average)" was $58,753. Both parties' experts observed that in 2013, Mark's income based on the tax returns was significantly lower than it had been the 3 previous years. Sonia's expert provided analysis of Mark's annual income by looking at personal monthly credit card purchases and payments and determined that the credit card expenses, which were paid every month, routinely ran $15,000 per month over the 2 previous years.

The referee detailed his analysis in calculating Mark's earning capacity as well as actual earnings, utilizing Mark's expert's cashflow analysis together with Mark's monthly salary. The referee utilized total monthly income for Mark of $15,148.17 in its child support worksheet. Sonia filed exceptions to the determination of Mark's income.

In contrast to the referee, the district court considered entirely different information in determining Mark's monthly income, including credit card payments for Mark's personal expenses paid by one of the family businesses and depreciation taken on real estate. The district court determined that Mark's gross monthly income is at least $33,481. However, it utilized total monthly income for Mark of $20,000 on the child support worksheet attached to the decree. The district court did not determine that the referee's findings regarding Mark's income were clearly against the weight of the evidence.

We conclude that there was sufficient evidence to support the referee's determination of Mark's income and that it was not clearly against the weight of the evidence. The district court erred in modifying Mark's income and in its corresponding calculation of child support. We modify the decree to incorporate the referee's determination of Mark's income of $15,148.17.

### (ii) Sonia's Income

At the time of trial, Sonia was 44. She was born in Mexico and first came to the United States from Spain at age 16 as an exchange student. After finishing her last year of high school and first year of college in Spain, she returned to the United States at age 18 or 19 and has continued to reside here since. Sonia had not worked outside the home since January 2000 when she was pregnant with the parties' son. Sonia does have a college degree, and she had limited experience in the jewelry business after the parties were married, earning approximately $25,000 per year.

The referee found that Sonia has some earning capacity not to exceed an annual gross income of $25,000 per year. On the child support worksheet, the referee utilized total monthly income for Sonia of $2,083.33. No exception to this finding was filed by Sonia, and Mark withdrew his exception. The district court made a finding consistent with the referee's—that Sonia's earning capacity does not exceed $25,000 per year. On the child support worksheet, the district court used total monthly income for Sonia of $2,100 (rounding up the referee's figure). Because Mark withdrew his exception to the referee's findings, he is precluded from asserting error in the district court's determination of Sonia's income.

### (d) Worksheet 3

Mark asserts that the district court erred in failing to prepare worksheet 3 of the Nebraska Child Support Guidelines in calculating child support. The referee used worksheets 1 and

2 of the child support guidelines in calculating child support, consistent with the split custody award. No exception was filed by Sonia, and Mark withdrew his exceptions. The district court also used worksheets 1 and 2 in calculating child support on a split custody basis. Mark is precluded from asserting error in the district court's utilization of worksheets 1 and 2. Based upon our foregoing conclusions, we modify the decree to incorporate the referee's child support worksheets in place of the district court's worksheets.

### (e) Credit for Overpayment of Temporary Support

Mark asserts that the district court erred in improperly crediting Mark for overpayment of temporary child support. The record shows that Mark was paying temporary child support predicated on Sonia's having custody of all three children. Daniel began living with Mark in May 2013, and Mark's request to modify temporary support was deferred until the time of trial. Based upon the findings of the referee concerning Mark's income and the referee's split custody calculation, the referee found that Mark should have a credit of $1,372 per month for each month that he overpaid child support. Through September 2015, the referee recommended that Mark receive a credit of $30,184 against the money judgment owed rather than being subtracted from his child support obligation going forward. Sonia filed an exception to this finding.

The district court gave Mark credit for only 12 months of overpayments, and based upon its determination of child support owed by Mark under the split custody calculation, it determined the credit should be $13,512. The district court made no finding that the referee's determination of the amount of credit was clearly against the weight of the evidence.

We conclude that the evidence was sufficient to support the referee's determination of child support credit and that it was not clearly against the weight of the evidence. The district court erred in modifying the amount of credit to be given to

Mark. We therefore modify the decree to provide that Mark receive a credit of $30,184.

### (f) Private School Tuition

Mark asserts that the district court erred in requiring him to pay private school tuition. The referee recommended that Mark pay all tuition for the children in conformity with the parties' temporary stipulation through completion of the 2014-15 school year. The referee specifically declined to order Mark to continue to pay school tuition going forward. While the referee found (citing an unpublished case of this court) that a court could include education expenses in a support order if the court found such expenses were "'reasonable and necessary,'" including such expenses would constitute a deviation. The referee, in declining to order Mark to mandatorily pay these expenses, noted that it utilized the "optional extrapolation methodology" set forth in Neb. Ct. R. § 4-203(C) (rev. 2011) of the child support guidelines to the fullest extent possible in determining appropriate child support and included the regular and ongoing payment of personal credit card expenses through the businesses as income attributable to Mark. Sonia filed an exception to this decision.

The district court found that Mark should be required to pay the "school tuition and matriculation fees" for the children to attend any primary or secondary private school in Lincoln, Nebraska, for the next 5 years. Thereafter, the court ordered that each party shall be responsible for 50 percent of these costs for all children. The district court made no determination that the findings of the referee on this issue were clearly against the weight of the evidence.

We conclude that there was sufficient evidence to support the referee's findings regarding payment of school tuition, particularly given the amount of child support and alimony to be paid by Mark to Sonia, along with the substantial property awarded to Sonia. The referee's finding was not clearly against the weight of the evidence. The district court erred in

requiring Mark to pay for private school tuition and fees for the next 5 years and for the parties to thereafter split the cost. We modify the decree to incorporate the referee's findings regarding payment of school tuition.

## (g) Conclusion

As set forth above, we have found certain errors in the district court's findings relating to the parties' children, and we vacate and set aside those portions of the decree and modify the decree accordingly to incorporate the findings of the referee as to those issues.

## 5. ALIMONY

Mark asserts that the district court erred in awarding alimony.

[21,22] In considering alimony, a court should weigh four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the party seeking support to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). In addition to the specific criteria listed in § 42-365, a court should consider the income and earning capacity of each party and the general equities before deciding whether to award alimony. *Brozek v. Brozek, supra*.

[23-26] The statutory criteria for dividing property and awarding alimony overlap, but the two serve different purposes and courts should consider them separately. *Id.* The purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in § 42-365 make it appropriate. *Brozek v. Brozek, supra*. In weighing a request for alimony, the court may take into account all of the property owned by the parties when entering the decree, whether accumulated by their joint efforts or acquired by inheritance. *Id*.

The referee discussed the pertinent statutory factors set forth in § 42-365 in its consideration of alimony. The referee also considered the significant child support obligation that Mark is required to pay, the ages of the children, Sonia's limited employability, and the significant money judgment that will need to be paid over the next 10 years. The referee also recognized that Mark had already paid significant alimony since May 1, 2013. The referee found that commencing October 1, 2015, Mark should pay to Sonia the sum of $4,500 per month through April 30, 2019, for a total of 43 months. Thereafter, Mark should pay $4,000 per month for an additional 48 months, commencing May 1, 2019, and concluding after payment of the April 2023 payment. Sonia filed an exception to this decision.

The district court, while noting consideration of the same factors as the referee, determined that commencing December 1, 2015, Mark should pay Sonia $4,500 per month each month through November 30, 2025. The district court did not determine that the referee's findings were clearly against the weight of the evidence.

We recognize that as a result of our findings regarding the property division, Mark is no longer required to pay a money judgment to Sonia; rather, Sonia is now required to pay a money judgment to Mark, albeit of a far lesser amount. Nevertheless, the remaining factors cited by the referee in support of its alimony award lead us to conclude that the referee's award was not clearly against the weight of the evidence. The district court erred in substituting its own determination of alimony for that of the referee. Accordingly, we vacate and set aside that portion of the decree and modify the decree accordingly to incorporate the findings of the referee as to alimony.

## 6. Award of Fees

[27,28] Mark asserts that the district court erred in awarding attorney fees. In a marital dissolution action, an award of

attorney fees depends on a variety of factors, including the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013). A dissolution court deciding whether to award attorney fees should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

The referee recommended that Mark pay Sonia's attorney fees in the amount of $20,000 and costs of $20,000. Sonia filed an exception to this decision. The district court also ordered Mark to pay Sonia's attorney fees in the sum of $20,000 and costs of $20,000. Because Mark withdrew his exceptions to the referee's report, he is precluded from challenging the award of attorney fees on appeal.

## V. CONCLUSION

As set forth above, Mark has waived his right to appeal certain issues by accepting certain benefits of the judgment. He is precluded from challenging certain other portions of the decree because he withdrew his exceptions to the referee's report.

We hold that a trial court may only set aside or modify the report of a referee upon a determination that the referee's findings were clearly against the weight of the evidence. The district court made certain errors in setting aside or modifying findings of the referee which were supported by the evidence and not clearly against the weight of the evidence. As set forth above, we have vacated and set aside those findings and have modified the decree to incorporate the referee's findings as to those issues. We affirm the decree as modified.

Affirmed as modified.